Brian A. ZUCKERMAN, et al., Plaintiffs,

v.

**MCDONALD'S CORPORATION,**
Defendant.

No. Civ.A. 95–CV–30044–MAP.

United States District Court,
D. Massachusetts.

Feb. 9, 1999.

Mark I. Berson, Levy Winer Law Office, Greenfield, MA, Robert Zarco, Rosa I. Rodriguez, Zarco & Pardo, Miami, FL, for Brian A. Zuckerman, Martha W. Zuckerman.

Alice E. Zaft, Cooley, Shrair, Alpert, Labovitz & Dambrov, Springfield, MA, Alan H. Silberman, Sonnenschien, Nath, and Rosenthal, Chicago, IL, Jill A. Callian, Sonnenschein, Nath & Rosenthal, Chicago, IL, for McDonald's Corporation.

Alan H. Silberman, Sonnenschien, Nath, and Rosenthal, Chicago, IL,. Alice E. Zaft, Cooley, Shrair, Alpert, Labovitz & Dambrov, Springfield, MA, for Daniel A. Daigle, Joseph Deutschle, Michele Deutschle.

Charles K. Bergin, Jr., Robinson, Donovan, Madden & Barry, Springfield, MA, for A. Mark Rosen, Richard Spero, Robert H. Hapip, Ted Taylor, Dan Ashburn, Don Shapiro, Richard Bergstrom, Tim Scussel, Frank Behan.

### MEMORANDUM REGARDING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

PONSOR, District Judge.

## I. INTRODUCTION

Brian and Martha Zuckerman ("Plaintiffs") bring this action against McDonald's Corporation ("defendant"), seeking to recover for losses they allegedly incurred due to defendant's failure to "rewrite" five license agreements and, as to one franchise, for losses incurred due to what they characterize as an arbitrary withholding of assignment approval.

Plaintiffs' Third Amended Complaint, as originally filed, offers eight counts. Count One asserts that the defendant breached express and implied contracts as they related to rewrites. Count Two alleges that the defendant breached express and implied contracts by encroaching upon and denying plaintiffs' expansion rights. In Count Three, plaintiffs assert that the defendant breached express and implied contracts by arbitrarily withholding its consent to assignment. In Count Four, plaintiffs allege intentional fraud and misrepresentation and, in Count Five, negligent misrepresentation. Count Six alleges violations of Mass.Gen.Laws ch. 93A, §§ 2 and 11. Counts Seven and Eight allege violations of Connecticut Law.[1]

---

1. Plaintiffs have themselves moved to dismiss Counts Seven and Eight in their entirety, and

Defendant has submitted three separate motions for summary judgment. These motions make, essentially, two arguments. First, defendant contends that plaintiffs' claims are meritless because the contracts simply did not grant plaintiffs the rights they now attempt to enforce. Second, as to the portions of the complaint alleging misrepresentation, defendant asserts that the facts of record are insufficient to demonstrate *any* false representations or fraudulent intent. For the reasons set forth below, the court will allow all three of defendant's motions for summary judgment.

## II. FACTUAL BACKGROUND

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing defendant's motions for summary judgment, the court accepts the evidence in the light most favorable to plaintiffs. In this case, although the parties disagree about the legal effect and interpretation of the events, there is little or no dispute concerning the underlying facts.

### A. THE MCDONALD'S SYSTEM

Defendant, McDonald's Corporation, is a Delaware corporation with its principal place of business in Illinois, and is in the business (as everyone knows) of selling fast food. McDonald's issues franchises to individuals wishing to profit from participation in its system of restaurants. Although the particular franchisee maintains some level of auton-

omy, McDonald's, through its system of designated performance standards and district managers, maintains an ongoing involvement in the operations of each franchise.

This ongoing relationship between McDonald's and the franchisee is set forth in a series of agreements. At issue in this case are the license agreements and defendant's so-called "rewrite" policy. Each will be discussed separately.

### 1. The License Agreement

The license agreement is, in essence, the document evidencing the parties' "meeting of the minds." Plaintiffs' contract claims assert alleged breaches by the defendant of the "rewrite" and "assignment" provisions of the agreement. The court will, therefore, focus its discussion on these areas.[2]

The agreement's provision regarding potential license renewal is succinct and clear. First, at several points the exact term of the license, twenty years, is specified. More importantly, at the end of the document, the parties acknowledge that "[t]he term of this License is for a single twenty (20) year term *with no promise or representation as to the renewal of this License or the grant of a new License.*" (Emphasis supplied).

By contrast, over one page is devoted to the issue of assignment. Paragraph fifteen begins, "[w]ithout prior written consent of Licensor, Licensee's interest shall not be assigned or otherwise transferred in whole or in part...." Next, the license agreement addresses three situations where an assignment might occur.[3] Sub-paragraph (d) then covers the conditions upon which the licensor will permit any assignment to a third party. Specifically, this sub-paragraph states:

this motion (Docket No. 150) has been allowed. In addition, in a footnote to this motion, plaintiffs state "Count II should only exclude Greenfield/Greenfield II and Scitico/Stafford Springs from ¶¶ 78 and 80–81." (Docket No. 150, n. 2). Because Count Two only addresses encroachment and/or expansion denial relating to the Greenfield and Stafford Springs stores, by excluding the allegations concerning expansion or denial as it relates to Greenfield and encroachment as it relates to Stafford Springs, plaintiff has, essentially, eliminated these claims. The court will, therefore, treat Count Two as voluntarily dismissed as well.

2. The court has only been provided copies of the Adams, Great Barrington and Ware license agreements. All references to a "license agreement" are quoted from the March 13, 1974 Great Barrington agreement (Defendant's exhibit A–2). The parties' arguments assume that all pertinent agreement language is identical for the different franchises. The court has adopted this assumption.

3. Sub-paragraph (a) addresses death or permanent incapacity of licensee, (b) addresses assignment to licensee's corporation, and (c) addresses the licensor's retention of the first option to purchase. (Defendant's exhibit A–2, ¶ 15(a)–(c)).

In addition to any assignments or contingent assignments contemplated by the terms of sub-paragraphs (a) and (b) of this paragraph 15, Licensee shall not sell, transfer or assign this License to any person or persons without Licensor's prior written consent. Such consent shall not be arbitrarily withheld.

(Defendant's exhibit A–2, ¶ 15(d)). The license agreement specifies eight criteria used by the defendant in evaluating whether to grant or withhold its consent to an assignment.[4] The license agreement does not define the term "arbitrarily withheld."

The license agreement contains an integration clause, stating, "[t]his License (including any appendices hereto) constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties." In paragraph twenty-seven the license agreement specifies Illinois law as the governing law.

### 2. McDonald's Rewrite Policy

As noted above, the license agreement does not contain any clauses making provision for a rewrite of the license at the expiration of the twenty-year term. The informal documents that do discuss possible rewrites are not contractual but merely statements of policy and, therefore, not binding.

Defendant's rewrite policy is memorialized in what appears to be a brochure that, presumably, was distributed to franchisees.[5] In the first paragraph, the policy states, "we will offer a new license and lease ... to operators who have done a good job." This general statement is then followed up by descriptions which, arguably, define the term "good job." For instance, among other things, the policy describes the importance of Quality, Service and Cleanliness ("QSC") ratings, the restaurant's track record, the operator's progressiveness, aggressiveness and sense of team work.

After highlighting the general policy, the brochure describes how each operator will be evaluated for a rewrite. Although numerous other criteria are mentioned, the policy states that "over half," or the "single most important factor," is the particular restaurant's QSC ratings.[6] Concerning the timing of this evaluation, the policy states "[t]his evaluation will begin, on an individual basis, at the beginning of the 17th year of each license." (Rewrite Policy, p. 2., defendant's exhibit C–1). In the event of a negative review, the policy states that the licensee will be notified at the beginning of the 17th year, and be advised of "what positive steps he can take in order to qualify during the remaining four years of his license." (*Id.*). As an alternative, the operator may sell the business to a qualified buyer.

### B. CREATION OF PLAINTIFFS' FRANCHISE AGREEMENTS

In 1971, plaintiff Brian Zuckerman became a McDonald's franchisee when he became co-owner with his father, Herman Zuckerman, of a McDonald's franchise located in Green-

---

**4.** Phrased in terms of an illustration, these criteria include: work experience and aptitude, financial background, character, ability to personally devote full time and best efforts to managing the restaurant, residence in the locality of the restaurant, equity interest in the restaurant, conflicting interests and, "such other criteria and conditions as Licensor shall then apply in the case of an application for new License to operate a McDonald's restaurant." (Defendant's exhibit A–2, ¶ 15(d)(i) –(vii)).

**5.** This brochure is a synopsis of a speech given by the president of licensing, John Coons, in 1971. Defendant has submitted a copy of its rewrite policy entitled "Rewrite Policy As Amended 8–82." (Rewrite Policy, p. 2, defendant's exhibit C–1) Plaintiffs have not objected to this policy on the basis that it was not the written policy in effect at the time the particular license

agreements were signed in the mid or late 1970's. The court will, therefore, rely on this version of defendant's rewrite policy. Unless otherwise noted, descriptions of the policy will be from this exhibit.

**6.** The other criteria include: "degree of personal involvement in the operation; cooperation with the system and fellow operators; degree of aggressiveness in marketing; sales obtained versus potential sales; advertising participation and co-op involvement; physical condition and stamina of the owner/operator; analysis of the management ability concerning people development and people practices in your business; review of reinvestment in your business—past programs, as well as future needs; review of financial obligations to the company, purveyors and others." (Rewrite Policy, p. 2, defendant's exhibit C–1).

field, Massachusetts. During the next seven years, with the approval of McDonald's, plaintiff and Herman Zuckerman acquired franchise agreements for thirteen restaurants, of which only five are presently at issue.[7] In 1972, plaintiff and Herman Zuckerman acquired a franchise agreement for a restaurant in Ware, Massachusetts ("Ware"). In 1974, plaintiff and Herman Zuckerman acquired franchise agreements for two restaurants in Pittsfield, Massachusetts ("Pittsfield I" and "Pittsfield II"), one in Lenox, Massachusetts ("Lenox") and one in Great Barrington, Massachusetts ("Great Barrington").

In 1986, with the approval of McDonald's, Herman Zuckerman assigned his interest in the five franchises at issue to plaintiffs, Brian and Martha Zuckerman.[8] (B. Zuckerman, Dep. part I, p. 65). Some time later, plaintiffs created two entities, Habber Corporation ("Habber") and a partnership, HABCO ("HABCO").[9] Habber is owned by plaintiffs, and plaintiffs are the only partners in HABCO. (B. Zuckerman Dep. Part I, p. 23–24). Plaintiffs' interest in the Pittsfield I, Pittsfield II, Lenox and Great Barrington restaurants were subsequently transferred to Habber. Similarly, at some time after the assignment of Herman Zuckerman's interest to Brian and Martha Zuckerman, plaintiffs assigned their interests in the Ware store to HABCO. (B. Zuckerman Dep. Part I, p. 22–24).

### C.  PLAINTIFFS' FRANCHISES

#### 1.  Great Barrington

The original license agreement for the Great Barrington restaurant was signed on March 13, 1974 and ran for a term of twenty years, or no later than March 12, 1995. (Defendant's exhibit A–2). Although the original license agreement was between defendant and Sidney Zuckerman, Sidney's interest was at some point assigned to Herman and Brian Zuckerman. In 1981 it was assigned to Habber.[10]

The complaint and accompanying exhibits are bereft of facts concerning what occurred between the 1981 assignment of the license to Habber and defendant's decision not to rewrite the contract for the Great Barrington restaurant. Plaintiffs' only assertion is that between 1989 and August 1991 they reinvested $19,890 in "equipment and leasehold improvements" in the Great Barrington restaurant. (Third Amended Complaint, ¶ 62).

On August 15, 1991, defendant informed plaintiffs of its decision not to rewrite the license for the Great Barrington restaurant, which was to expire on June 13, 1994.[11] The letter states five reasons underlying the Rewrite Committee's decision that plaintiffs did not qualify for a rewrite:

1.  Inconsistent operations ranging from satisfactory to unacceptable;

2.  A lack of timely reinvestment which has resulted in a restaurant that is out of date and not competitive in the marketplace;

3.  A lack of consistent involvement on your part to direct the day-to-day operation of the business;

4.  An ongoing failure to pay McDonald's franchise fees and related charges on

---

7.  Plaintiffs have released all claims related to the Greenfield, Adams, Stafford Springs and North Adams stores. Therefore, although pled, the court will consider claims related to these restaurants to be withdrawn. (Docket No. 150, p. 2).

8.  Brian Zuckerman assumed 100% interest in the Great Barrington, Pittsfield I, Pittsfield II and Lenox stores. As to the Ware restaurant, Brian Zuckerman assumed a 95% interest and Martha Zuckerman assumed a 5% interest.

9.  It is unclear from the record when these entities were created, or when the transfer of plaintiffs' individual interests to these entities occurred. Plaintiffs, however, have confirmed the basic facts in their depositions and have not

contested that their individual interests were, in fact, transferred.

10.  The court has inferred this information from the original lease which contains the name Sidney Zuckerman and the August 21, 1981 amendment to the license which names Herman and Brian Zuckerman, as well as Habber, as parties in interest. (Defendant's exhibit A–2).

11.  It is unclear why the expiration date for the license is June 13, 1994. The original license to Sidney Zuckerman states the expiration date as twenty years from March 13, 1974, or no later than March 12, 1995. Plaintiffs do not, however, contest the license expiration date.

time as well as an overall poor financial condition.

5. Poor development and training of crew and management.

(August 15, 1991 letter, defendant's exhibit B–2, p. 1–2). Defendant then recommended that plaintiffs consider sale of the business to a purchaser acceptable to defendant under its "customary" criteria, and reminded plaintiffs that the burden was on plaintiffs to find a qualified purchaser. Among other conditions of sale, defendant stated "the purchaser [must] immediately complete all reinvestment deemed necessary by McDonald's to bring the restaurant up to McDonald's then current standards for a contemporary, competitive facility." (*Id.* at 2).

Plaintiffs assert that, as a condition of sale, defendant required plaintiffs to reduce the sale price by the "required reinvestment." (Third Amended Complaint, ¶ 86). After receiving the August 15, 1991 letter, plaintiffs sold the Great Barrington franchise at a price reduced by the "required reinvestment" the new owners would have to make under defendant's reinvestment policy. (*Id.* at ¶ 65). According to plaintiffs, defendant then did not require the new owners to make the "required reinvestment." (*Id.*). As a result, plaintiffs claim that McDonald's found a replacement for the Zuckermans, who got a bargain price for the franchise at plaintiffs' expense.

### 2. Ware

The original license agreement for the Ware restaurant was signed on May 9, 1972 and ran for a term of twenty years.[12] (Defendant's exhibit A–3). In February 1987, according to plaintiffs, Henry Gonzalez, Jr. and David Murphy—defendant's field service managers for the Hartford District—met with plaintiffs concerning the Ware restaurant. (Third Amended Complaint, ¶ 31). Plaintiffs allege that during the meeting Gonzalez told them that if they did not invest in the Ware restaurant immediately he would not recommend them for a rewrite.

In March 1987, the Ware restaurant received a QSC rating of CFC.[13] (*Id.*, ¶ 32). Sometime thereafter, plaintiffs borrowed $738,000 to rebuild the Ware restaurant, which reopened in October 1988.[14] (Id., ¶ 33). Immediately after the Ware restaurant was reopened, it received a QSC rating of "AAA." This rating was repeated again on November 29, 1989.[15]

By letter dated December 15, 1989, defendant notified plaintiffs that it did not "wish to enter into new franchise relationships with [plaintiffs]" at the Pittsfield I, Ware, Pittsfield II and Lenox restaurants.[16] These franchises were set to expire on October 4, 1991, July 31, 1992, October 31, 1992 and December 10, 1993, respectively. The decision not to offer plaintiffs rewrites for these restaurants was based on the following deficiencies:

1. Inconsistent operations ranging from satisfactory to unacceptable.

2. A lack of timely reinvestment which has resulted in restaurant facilities that are out of date and are not competitive in the marketplace.

3. Poor development and training of crew and management.

4. Failure on your part to effectively manage and direct a ten restaurant organization in order to achieve at least minimally acceptable operational levels on a consistent basis and ad-

---

12. This agreement was between defendant and Herman Zuckerman, Arline D. Zuckerman and Brian A. Zuckerman. On the same day the license agreement was signed, the lease was assigned to HABCO where Herman Zuckerman had a 65% interest and Brian Zuckerman had a 35% interest. (Defendant's exhibit A–3).

13. It is unclear from the record what "CFC" means. However, it is apparent from plaintiffs' allegations in ¶ 32 of the complaint that a rating of CFC is unacceptably low. The court will assume this as true.

14. In August 1987, prior to their reinvestment in the Ware restaurant, plaintiffs asked defendant for a rewrite decision one year early. (Third Amended complaint, ¶ 36).

15. Again, the court has not been provided a scale of QSC ratings; presumably, "AAA" is a positive rating.

16. This letter also mentioned plaintiffs' Hadley restaurant, which is not at issue in this case.

dress reinvestment needs on a timely and ongoing basis.

(Defendant's exhibit B–1).

As to the Ware and Lenox restaurants, the letter stated that in 1991 defendant would reconsider the "no rewrite" decision by evaluating plaintiffs' overall McDonald's performance. In addition, the letter specified five criteria that would be used to reevaluate the "no rewrite" decision as to these particular restaurants.[17]

Despite this level of detail, the letter went on to state that completion of reinvestment and correction of the aforementioned deficiencies would *not* guarantee a rewrite, and the decision whether to rewrite was in defendant's sole discretion. Moreover, the letter warned that there was a "real possibility" that the committee would not recommend a rewrite of the Ware and Lenox restaurants in 1991. In conclusion, as with the Great Barrington denial letter, defendant reminded plaintiffs of the conditions required for sale of the franchise and the requirement that the new purchaser bring the restaurant up to the "then current" standards through reinvestment.

### 3. Lenox

Plaintiffs' license agreement for the Lenox restaurant was set to expire on December 10, 1993.[18] On December 15, 1989, as noted above, the rewrite committee informed plaintiffs that the Lenox franchise would not be offered a rewrite due to the four deficiencies previously outlined. However, as with the Ware restaurant, plaintiffs were offered the opportunity to improve their performance in five specific areas. Nevertheless, as with the Ware restaurant, defendant maintained that compliance with the five conditions of improvement would *not* guarantee a rewrite when the committee reevaluated the Lenox restaurant in 1991.

Plaintiffs assert that McDonald's field manager, Gonzalez, informed them that defendant was considering rebuilding the Lenox restaurant, emphasizing the need for plaintiffs to reinvest in this restaurant. (Third Amended Complaint, ¶ 48). It is unclear from the record whether this conversation occurred before or after the December 15, 1989 "no rewrite" letter. After speaking with Gonzalez, however, plaintiffs invested $13,590 for "leasehold, equipment and other improvements" at the Lenox restaurant. (*Id.*, ¶ 49).

On December 23, 1991, defendant informed plaintiffs that the "no rewrite" decision of December 15, 1989 for the Lenox restaurant was final. (December 23, 1991 letter, defendant's exhibit B–3). Defendant gave two

---

17. The five criteria were:

1. Consistently maintaining McDonald's minimum standards of Q.S.C. ("C" grade or better in each of the three Q.S.C. categories) for 1990 and 1991 on a day in, day out basis as evaluated by McDonald's on all restaurant visits, at all of your restaurants.
2. Immediately implementing an ongoing plan for timely reinvestment as outlined by the region in order to bring all of your restaurant facilities to current and competitive standards. All necessary M & R must be promptly undertaken as well. As you know, we are currently considering a rebuild for the restaurant in Lenox. Minimal reinvestment as outlined by the region will be required until the decision to rebuild is made. However, due to your failure to maintain a competitive facility, substantial investment on your part will be required at such time as a rebuild decision is finalized.
3. Implementing a program of awareness and direction for yourself in order to increase your daily involvement in the supervision of your restaurant businesses to an acceptable

level, including attendance at all operations reports visits, at least 50% of the Co-op meetings, all operator business and financial reviews, and day to day participation in the restaurants' operations.
4. Developing and implementing an effective training program for management and crew which would include attendance at Hamburger University and all other specified training classes for store managers. The Committee also recommends that you personally recycle through all formal training classes (BOC, IOC, AEC, AND AOC).
5. Developing a management team which is qualified to oversee and operate an eight restaurant organization.

(Defendant's exhibit B–1)

18. The court has not been provided copies of the original license agreement, or any subsequent assignment. Presumably, the agreement began on December 10, 1973 and ran for a term of twenty years. The date for termination of the license, December 10, 1993, has not been contested.

reasons for this decision: first, the current review by the rewrite committee found that "the factors which led to the original denial of rewrite continue to exist and that there has not been sufficient improvement to warrant a change in our overall evaluation of your qualifications[;]" and second, defendant decided to close the Lenox business permanently on the date of expiration of the license term, December 10, 1993.[19] (*Id.*).

#### 4. *Pittsfield I and Pittsfield II*

Plaintiffs' license agreements for the Pittsfield I and Pittsfield II restaurants were set to expire on October 4, 1991 and October 31, 1992, respectively.[20] On December 15, 1989, as noted above, defendant informed plaintiffs that the rewrite committee had recommended that the Pittsfield I and Pittsfield II franchises not be offered rewrites due to the four deficiencies previously outlined. Unlike the Lenox and Ware restaurants, however, defendant informed plaintiffs that, due to plaintiffs' "severe operational deficiencies in the two Pittsfield restaurants," its decision not to rewrite these license agreements was final. In order to focus their efforts on the remaining restaurants, defendant further recommended that plaintiffs immediately sell the assets of the Pittsfield restaurants, including the franchise rights, to a qualified purchaser approved by defendant. Defendant then informed plaintiffs of their rights surrounding the sale of these restaurants and the requirements for securing a qualified purchaser.

According to plaintiffs, prior to the December 15, 1989 final "no rewrite" letter, both the Pittsfield restaurants received satisfactory QSC ratings. (Third Amended Complaint, ¶ 44). Plaintiffs sold the two Pittsfield restaurants on June 1, 1991 at what they allege was below market value. (*Id.*, ¶ 46).

### III. DISCUSSION

Plaintiffs seek to recover under several theories: breach of express and implied contract in failing to renew the license agreements for the five restaurants (Count One); breach of express and implied contract as to defendant's withholding of assignment approval for the Great Barrington restaurant (Count Three); intentional misrepresentation and fraud as to the Lenox and Great Barrington restaurants (Count Four); negligent misrepresentation as to the Lenox and Great Barrington restaurants (Count Five); and, as to the Ware restaurant, violation of Mass. Gen.Laws ch. 93A, §§ 2 and 11 (Count Six).[21]

As a preliminary matter, defendant maintains that plaintiffs, as individuals, lack standing to pursue any of these claims. In support of this argument, defendant asserts that any rights plaintiffs may have had arising from the Pittsfield I, Pittsfield II, Lenox and Great Barrington restaurants were assigned to Habber. Similarly, any rights plaintiffs might have had arising from the Ware restaurant were assigned to HABCO.

Technically, defendant is correct. It would, however, be a simple matter for plaintiffs to amend their complaint. Because all of plaintiffs' claims lack merit as a matter of law, in the interest of judicial economy the court will treat plaintiffs' complaint as if it had been amended to resolve the standing issue.

### A. BREACH OF EXPRESS AND IMPLIED CONTRACT: THE REWRITE CLAIMS

Plaintiffs' rewrite claims purport to arise from the Great Barrington, Lenox, Ware,

---

**19.** Despite the decision to close the Lenox restaurant permanently, defendant informed plaintiffs that they had the right to sell the restaurant to a buyer for the remainder of the term. (December 23, 1991 letter, defendant's exhibit B–3).

**20.** The court has not been provided copies of the original license agreement, or any subsequent assignment for either of the Pittsfield restaurants. Presumably, the agreements began on October 4, 1971 and October 31, 1972 respectively, and ran for terms of twenty years. The dates for termination of the licenses, October 4, 1991 and Octo-

ber 31, 1992, have not been contested by the parties.

**21.** Plaintiffs also sought recovery under two Connecticut statutes, Conn.Gen.Stat. § 42–133E and Conn.Gen.Stat. § 42–110B. Plaintiffs have subsequently moved to dismiss these claims. (Docket No. 150). Similarly, as noted above, the court will treat Count Two as dismissed due to plaintiffs' release of all claims relating to the Greenfield and Stafford Springs restaurants. (*Id.*).

Pittsfield I and Pittsfield II license agreements. Pursuant to the terms of these license agreements, the court will apply Illinois law.[22]

Under Illinois law, when interpreting a contract, the court is to look first to the express language of the parties' agreement. *See Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990, 994 (Ill.1990). Here, the express language of the license agreement states: "[t]he term of this License is for a single twenty (20) year term with no promise or representation as to the renewal of this License or the grant of a new License." Based on this contractual provision, plaintiffs have no express rights to rewrites of the franchises. *See Chang v. McDonald's Corp.*, 105 F.3d 664, C.A. No. 95–16012, 1996 WL 742455 at *1 (9th Cir. Dec.19, 1996).

*Chang* is directly on point. In *Chang*, the court considered a breach of contract claim concerning the failure of McDonald's to renew a plaintiff's franchise. In addressing plaintiff's claim, the court considered language nearly identical to the provisions of the license agreement in this case. *See id.*

Plaintiffs assert that defendant, nevertheless, breached the implied covenant of "good faith and fair dealing" by exercising its discretion not to offer plaintiffs a rewrite in an arbitrary and capricious manner. In support of this position, plaintiffs cite *Scheck v. Burger King Corp.*, 756 F.Supp. 543 (S.D.Fla. 1991). In *Scheck*, the court considered whether the implied covenant of good faith and fair dealing might apply to Burger King's decision to open another restaurant in plaintiff's market area, even though the contract expressly denied plaintiff the right to an exclusive market area. *See id.* at 549. The court concluded that, despite the express contract provision, the covenant did apply. *See id.*

Although *Scheck* offers some support to plaintiffs' argument, under Illinois law the covenant of good faith and fair deal-

ing is used to determine the parties intent only when the contract is ambiguous. *See Saunders v. Michigan Ave. Nat'l Bank*, 278 Ill.App.3d 307, 214 Ill.Dec. 1036, 662 N.E.2d 602, 609 (1996). Thus, where a party is vested with discretion, and the terms of the contract are ambiguous, under the covenant of good faith and fair dealing, the party may not exercise its discretion arbitrarily or capriciously. *See Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958, 972 (1984).

In this case, this principle never arises because the express terms of the license agreement are unambiguous: McDonald's is under no obligation to renew the license or grant plaintiffs a new license. The court in *Chang* addressed a similar argument and reached the same conclusion. *See Chang*, 105 F.3d 664, 1996 WL 742455, at *2.

In sum, because the contract terms unambiguously provide that defendant is under no obligation to renew the license or grant plaintiffs a new license, plaintiffs have no contractual rights, express or implied, to rewrites on any of the five license agreements. Defendant's motion for summary judgment on Count One will therefore be allowed.

## B. BREACH OF EXPRESS AND IMPLIED CONTRACT: THE ASSIGNMENT CLAIM

Plaintiffs also contend that the defendant arbitrarily withheld approval of an assignment of the Great Barrington franchise, thus violating the covenant of good faith and fair dealing. Again, pursuant to the terms of the license agreement, the court will apply Illinois law.

This claim suffers a fatal defect at the threshold. As noted above, under Illinois law, the covenant of good faith and fair dealing only applies where the contract terms are ambiguous. In this case, the parties' agreement concerning assignment is explicit: "Licensee shall not sell, transfer or assign this License to any person or persons without Licensor's prior written consent. Such con-

---

22. Although the license agreement expressly provides that Illinois law shall apply, the result would be the same if Massachusetts law were applied. Moreover, plaintiffs have conceded that Illinois law applies. (*See* Plaintiffs' Opposition to Defendant's Motion for Summary Judgment on Counts I and II, p. 14, docket no. 136).

sent shall not be arbitrarily withheld." (Great Barrington license agreement, defendant's exhibit A–2, ¶ 15(d)). Although the term "arbitrarily withheld" is not specifically defined, the contract itself cannot be described as ambiguous. Indeed, the license agreement is quite detailed.

For instance, the license agreement specifies criteria to be used in determining whether to consent to the assignment. These factors include: financial background, equity interest in the restaurant and, "such other criteria and conditions as Licensor shall then apply in the case of an application for new License to operate a McDonald's restaurant." (*Id.* ¶ 15(d)(i)–(vii)).

Therefore, as with plaintiffs' rewrite claims, because the express terms of the license are unambiguous, under Illinois law, the covenant of good faith and fair dealing does not apply. *See Chang,* 105 F.3d 664, 1996 WL 742455, at *2.

■ Moreover, even if the covenant of good faith and fair dealing did apply, the court finds, as a matter of law, that defendant's actions were not arbitrary or capricious. In the August 15, 1991 letter notifying plaintiffs of its decision not to rewrite the Great Barrington license agreement, defendant suggests that plaintiffs consider selling the restaurant, but warns, "the purchaser [must] immediately complete all reinvestment deemed necessary by McDonald's to bring the restaurant up to McDonald's then current standards for a contemporary, competitive facility." (August 15, 1991 letter, defendant's exhibit B–2, p. 2). Even if this suggestion became, as plaintiffs contend, a requirement of the assignment, as a matter of law, this condition is not arbitrary, but merely reflected considerations openly contemplated by the parties.

Defendant denied plaintiffs a rewrite for the Great Barrington restaurant, in part, because of "lack of timely reinvestment which has resulted in a restaurant that is out of date and not competitive in the marketplace." (*Id.* at 1–2). Within the license agreement, failure to maintain and operate the restaurant in compliance with the defendant's standards is explicitly considered a material breach of the contract. (Great Barrington

license agreement, ¶ 18(a), defendant's exhibit A–2). Thus, even if defendant did compel plaintiffs—as a condition of approval of assignment—to reduce the purchase price by the amount of investment required to comply with defendant's standards, this action was not arbitrary. Defendant's motion for summary judgment on Count Three will therefore be allowed.

## C. THE INTENTIONAL AND NEGLIGENT MISREPRESENTATION CLAIMS.

Plaintiffs' intentional and negligent misrepresentation claims arise from the operation of the Lenox and Great Barrington restaurants. Because these are not contract claims and because the facts surrounding these claims occurred in Massachusetts, unlike the preceding claims, the court will apply Massachusetts law.

■ In Massachusetts, to make out a claim for intentional misrepresentation, a plaintiff must prove (1) that the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act on the false representation, and (4) plaintiff relied on the representation to his or her detriment. *See Bouvier Bros. Inc. v. Baker Protective Serv.,* No. 93421, 1994 WL 879634, at *3 (Mass.Super. April 15, 1994) (quoting *Barrett Assocs., Inc. v. Aronson,* 346 Mass. 150, 152, 190 N.E.2d 867 (1963)).

■ By contrast, to prove negligent misrepresentation, plaintiff must prove that a misrepresentation occurred but need not prove it occurred with the defendant's knowledge. Instead, plaintiff must prove that the misrepresentation of defendant's statement could have been discovered by the defendant if the defendant had exercised diligence. "[U]nder Massachusetts law actionable misrepresentation may occur without the speaker's knowledge that the statement is false if the truth is reasonably susceptible of actual knowledge, or otherwise expressed, if, through a modicum of diligence, accurate facts are available to the speaker." *Acushnet Fed. Credit Union v. Roderick,* 26 Mass. App.Ct. 604, 605, 530 N.E.2d 1243 (1988)

(citations omitted). The distinction between intentional and negligent misrepresentation is, therefore, the nature of defendant's knowledge or intent at the time the allegedly false representation was made.

### 1. The Lenox Claims

■ As to the Lenox restaurant, plaintiffs ground their intentional misrepresentation claims on the assertion that, in 1989, when defendant informed plaintiffs that it would review its no rewrite decision in 1991 based upon, among other things, plaintiffs' reinvestment in the restaurant, defendant knew or should have known that it actually intended to permanently close the Lenox restaurant. Alternatively, plaintiffs aver that defendant engaged in negligent misrepresentation because this information was susceptible of knowledge through a modicum of diligence. Plaintiffs further allege that they relied on defendant's false statements to their detriment by investing $13,590 in the Lenox restaurant only to be told in December 1991 that defendant intended to close that site permanently.

To succeed on the intentional misrepresentation claim, plaintiffs must show that in 1989, when the representations were made by defendant concerning reinvestment, these representations were (1) false, and (2) that defendant *never* intended to rewrite the Lenox restaurant. The record utterly fails to support plaintiffs on either point.

■ Although, generally speaking, issues of intent are considered questions for the jury, the existence of potential questions regarding intent does not automatically preclude summary judgment. *See Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 929 (1st Cir.1983). Instead, to survive a motion for summary judgment, plaintiffs must present *some* facts in support of their assertion as to defendant's intent.

*See id.* Here there is no evidence—other than speculation—that the defendant knew or should have known in 1989 that in 1991 it would decide to close the Lenox restaurant permanently.[23] In fact, the only evidence to be found in the record supports the opposite conclusion.

On August 2, 1988 defendant wrote plaintiffs concerning several of their restaurants, including Lenox. (Defendant's exhibit X).[24] In this letter, defendant makes no representations as to a particular plan of action, but states "we should take a look at our positioning for the entire market...." Given the context of the letter, the reference to "positioning" *could* suggest the *possibility* of eliminating the Lenox restaurant eventually. It is abundantly clear, however, that no specific decision in this regard had been made. If anything, this letter supports the conclusion that permanently closing the Lenox restaurant was *not* actively under consideration in 1988.

The first documentation evidencing defendant's intent to close the Lenox restaurant permanently is an internal memo to the regional representative, Henry Gonzalez, dated September 24, 1991.[25] In this memo, defendant recommends closing the Lenox restaurant at the end of the license period "if sales have not improved." Plaintiffs were then informed on December 23, 1991 of defendant's decision to close the Lenox restaurant permanently.

These documents, if they show anything, demonstrate that defendant's representations in 1989 were not false. In 1989, when the allegedly false representations were made, the evidence clearly suggests that the defendant did not know it would permanently close the Lenox restaurant in 1991. No evidence supports a contrary inference. Plaintiffs' intentional misrepresentation claim therefore fails and defendant's motion for summary

---

**23.** In 1991 defendant informed plaintiffs that it had decided to close the Lenox restaurant at the end of the franchise term in 1993. The Lenox restaurant did, in fact, close in 1993.

**24.** In this letter, defendant specifies the challenges the Lenox restaurant faced due to the presence of a Burger King and a Hardee's in such a small town. (Defendant's exhibit X).

**25.** Defendant points to a December 10, 1991 internal memo as the first documentation of its decision to close the Lenox restaurant permanently. (Defendant's exhibit, W–1). The September 24, 1991 letter was written before this letter and holds essentially the same information.

judgment as to the Lenox restaurant in Count Four will be allowed.

■ Based on the same documents, plaintiffs' negligent misrepresentation claim also fails. As noted above, to prove this claim, plaintiffs must show that, although defendant may not have actually known of the falsity of the representation, it was (1) in fact false, and (2) "reasonably susceptible" of actual knowledge at that time if the defendant had exercised due diligence. *See Acushnet Fed. Credit Union*, 26 Mass.App.Ct. at 605, 530 N.E.2d 1243.

Put another way, to avoid summary judgment, plaintiff must present enough facts to justify a factfinder in concluding that, had defendant exercised due diligence, it could have discovered in 1989 (when the supposedly false representations were made) that its statements concerning reinvestment were false and that it would *not* offer plaintiffs a rewrite in 1991, or that it planned to close the Lenox restaurant permanently at the end of the lease term. The evidence of record offers no support for this conclusion. Plaintiffs' negligent misrepresentation claim therefore fails and defendant's motion for summary judgment as to the Lenox restaurant in Count Five will be allowed.

### 2. *The Great Barrington Claims*

As to the Great Barrington restaurant, plaintiffs base their intentional and negligent misrepresentation claims on their assertion that, in 1991, when defendant informed plaintiffs of its intention to make approval of assignment contingent on the assignee's completion of required reinvestment, it in fact had *no* intention of requiring the assignee actually to complete the reinvestment. Alternatively, plaintiffs claim that the falsity of the statement regarding reinvestment was "reasonably susceptible" of actual knowledge. As with the Lenox restaurant, plaintiffs' intentional and negligent misrepresentation claims as to the Great Barrington restaurant fail.

As noted above, to avoid summary judgment on the intentional misrepresentation claim, plaintiffs must do more than offer bald allegations or conjecture concerning defendant's intent. Plaintiffs must provide *some* evidence, other than speculation, from which a jury could conclude that (1) the representations made in 1991 concerning requiring reinvestment were false, and (2) in 1991 defendant had no intention of requiring the third-party purchaser to complete the required investment. Moreover, in this claim, plaintiffs must also present at least some evidence concerning their reliance and consequent detriment. Plaintiffs have provided no significant evidence on any of these points. In fact, powerful evidence exists to the contrary.

First, in the June 1, 1994 "Assignment and Consent to Assignment of Franchise to an Individual Purchaser," to which plaintiffs were assignors, defendant's intent to require reinvestment on the part of the third-party purchaser was set forth with particularity. Paragraph 3(e) specified four upgrades to be completed by May 31, 1995.[26] Although plaintiffs have not defined the investment defendant allegedly failed to require on the part of the third-party purchaser, these covenants presumably form the basis of their argument. The record is undisputed that, as of June 1, 1994, defendant explicitly intended to require the third-party purchaser to complete certain upgrades.

Second, in their purchase and sale agreement with the third-party purchaser, plaintiffs themselves never included language requiring reinvestment. (Defendant's exhibit G). Although the purchase and sale agreement includes certain representations and warranties of the purchaser, reinvestment is not included among them. (*Id.*). Plaintiffs can hardly claim to have been surprised and injured by the purchaser's failure to perform a reinvestment not even mentioned in the purchase and sale agreement.

Third, concerning plaintiffs' detrimental reliance, in the 1991 letter defendant never told plaintiffs to reduce the purchase price by the amount of any reinvestment necessary.

---

**26.** These upgrades included: regular menu staging, replacing the ice machine, building restrooms accessible to the handicapped and purchasing a two-tier table for the English muffin toaster. (Defendant's exhibit G).

Plaintiffs seem to have taken this step entirely on their own. Reducing the purchase price may perhaps have been a judicious business decision on plaintiffs' part, but they cannot now claim that the 1991 letter set forth reduction in price as a directive.

Although the record is unclear as to what the facts are concerning investment on the part of the third-party purchaser, it is sufficient to say that the new owners never completed the investment described in the assignment document. This fact does not, however, save plaintiffs' claim. The assignment document and purchase and sale agreement show that defendant's representations in the 1991 letter were not false. These documents also demonstrate that, in 1991 when the representations were made, the defendant did not know it would *not* require the third-party purchaser to complete the agreed-upon investment in the Great Barrington restaurant. Again, no evidence offers any support for a contrary conclusion.

■ Moreover, even assuming *arguendo* that the 1991 representations concerning requiring investment were intentionally false, plaintiffs are unable to show that they reasonably relied on these statements to their detriment. As noted, the 1991 letter simply does not require plaintiffs to reduce the purchase price by the amount of investment necessary. Plaintiffs' intentional misrepresentation claim, therefore, fails and defendant's motion for summary judgment as to the Great Barrington restaurant in Count Four will be allowed.

Based on the same documents, plaintiffs' negligent misrepresentation claim also fails. As noted above, to prove this claim, plaintiffs must show that, although defendant may not have known of the falsity of the representation, it was in fact false and "reasonably susceptible" of actual knowledge at that time, if the defendant had exercised due diligence. *See Acushnet Fed. Credit Union,* 26 Mass. App.Ct. at 605, 530 N.E.2d 1243.

Despite this lower burden, plaintiffs' negligent misrepresentation claim as to the Great Barrington restaurant is so attenuated, as a matter of logic, that it borders on the absurd. To get to the jury on this claim, plaintiffs would have to submit evidence, first, that, in 1991, when defendant made the representations concerning investment on the part of a third-party purchaser, defendant *knew* that it would not require the then unknown purchaser to complete the investment, thus rendering the representation false. Second, plaintiffs would have to show that, although defendant was not aware of its own intent, this knowledge could have been acquired through due diligence. Finally, to prove plaintiffs' reliance on the purportedly false representations, plaintiffs would have to show that these representations would have the effect of forcing plaintiffs to reduce the purchase price by the amount of required investment that defendant secretly never intended to demand. Not only is this sequence of suppositions nearly impossible to conceive, no evidence presented supports it.[27] Plaintiffs' negligent misrepresentation claim therefore fails and defendant's motion for summary judgment as to the Great Barrington restaurant in Count Five will be allowed.

## D.   THE CHAPTER 93A CLAIM

Plaintiffs' chapter 93A claim relates to the Ware restaurant. The facts surrounding this claim occurred in Massachusetts, and therefore, Massachusetts law applies. Because plaintiffs' common law misrepresentation claims fail, plaintiffs are unable, as a matter of law, to proceed on their chapter 93A claim. *See Spenlinhauer v. Kane,* No. Civ. A. 9601–ST–044887, 1998 WL 474170, at *4 (Mass. App.Ct. August 4, 1998) (stating that "if the plaintiff is unable to produce evidence that demonstrates the essential elements of a claim for fraud (or deceit) at common law, as a matter of law the plaintiff would have no reasonable expectation of proving a violation of c. 93A") (citations omitted).

Because plaintiffs have failed on all of their common law misrepresentation claims, it is not necessary for the court to discuss the requirements of a chapter 93A claim. Defen-

---

**27.** Plaintiffs may have instinctively known the absurd nature of their negligent misrepresentation claims; despite the heading, the language of the pleading itself is couched in terms of intentional misrepresentation. (Third Amended Complaint, ¶¶ 106–120).

dant's motion for summary judgment on the chapter 93A claim in Count Six will be allowed.

### IV. CONCLUSION

Despite plaintiffs' attempts through argument and speculation to demonstrate malicious motive on the part of the defendant, the record lacks any support for plaintiffs' claims. While plaintiffs may perhaps feel injured by defendant's arguably hardnosed business practices, no evidence remotely suggested that these practices amount to breach of contract or misrepresentation.

Defendant's motions for summary judgment will therefore be ALLOWED as to all counts. A separate order will issue.

### ORDER

For the reasons stated in the accompanying Memorandum, defendant's Motions for Summary Judgment (Docket Nos. 97, 99 & 101) are hereby ALLOWED. The clerk is ordered to enter judgment for defendant on all counts.