Joseph **YERARDI, et al., Plaintiffs,**

v.

**PACIFIC INDEMNITY COMPANY, et al., Defendants.**

**Civil Action No. 03–10770–JGD.**

United States District Court, D. Massachusetts.

March 29, 2006.

H. Christopher Boehning, Timothy S. Martin, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, Bradford R. Carver, Hinshaw & Culbertson LLP, CharCretia V. DiBartolo, Cetrulo & Capone LLP, Boston, MA, for Defendants.

Steven J. Brooks, Daniel R. Deutsch, Deutsch Williams Brooks DeRensis & Holland, P.C., Boston, MA, for Plaintiffs.

## *MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT*

DEIN, United States Magistrate Judge.

### I. *INTRODUCTION*

This case involves a dispute as to whether the defendants, Pacific Indemnity Company ("Pacific"), Federal Insurance Company ("Federal") and Chubb & Son, Inc. ("Chubb"), are obligated to make payments to the plaintiffs, Joseph and Jennifer Yerardi (the "Yerardis"), pursuant to the terms of a homeowners insurance policy. The Yerardis, who are husband and wife, submitted a claim under the policy after a house and pool house owned by Jennifer Yerardi were damaged extensively by fire on October 23, 2002. On March 18, 2004, following the completion of an investigation regarding the Yerardis' claim, Pacific denied coverage under the policy. Pacific's denial was based on its conclusion that the fire had been set by the Yerardis or at their direction, as well as on its determination that the Yerardis had misrepresented and concealed material facts relating to the fire loss and the

circumstances leading up to the loss. The Yerardis maintain that these accusations are false and that they are entitled to coverage under the insurance policy.

On March 19, 2003, the Yerardis filed this lawsuit against the defendants in state court, and the defendants subsequently removed the action to this court. In their First Amended Complaint, the Yerardis assert claims against the defendants for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), violations of Mass. Gen. Laws ch. 93A and Mass. Gen. Laws ch. 176D (Count III), and infliction of emotional distress (Count V). Additionally, the Yerardis are seeking injunctive relief precluding the defendants from taking any action against the Yerardis, prior to the final adjudication of this litigation, to recover payments that the defendants made to the Yerardis' mortgagees as a result of the loss (Count IV). Defendant Pacific has asserted counterclaims against the Yerardis, which are set forth in the defendants' First Amended Answer, Affirmative Defenses and Counterclaims. Specifically, Pacific's claims consist of counts for fraud (Count 1), intentional misrepresentation (Count 2), negligent misrepresentation (Count 3), breach of contract (Count 4), and unjust enrichment (Count 5).

Presently before the court are the defendants' motion for summary judgment on all of the claims and counterclaims and Jennifer Yerardi's motion for partial summary judgment on all claims and counterclaims as they relate to her. For the reasons detailed herein, this court finds that the defendants are entitled to judgment as a matter of law on the plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, as well as on the plaintiffs' emotional distress claim and on their claim pursuant to ch. 93A and 176D. This court further finds that there are disputed facts precluding the entry of summary judgment for any of the moving parties in connection with the remaining claims and counterclaims. Therefore, the defendants' motion for summary judgment (Docket No. 76) is ALLOWED IN PART and DENIED IN PART, and Jennifer Yerardi's motion for partial summary judgment (Docket No. 72) is DENIED.

## II. STATEMENT OF FACTS[1]

### Jennifer Yerardi's Purchase of 134 Chestnut Hill Road

Plaintiffs Jennifer and Joseph Yerardi are husband and wife. (DF ¶1). They reside with their three children at 338 Langley Road in Newton, Massachusetts. (PF ¶1). In June 2001, Jennifer Yerardi

---

1. The facts are derived from the following materials submitted by the parties: (1) Defendants' Rule 56. 1 Statement of Facts as to Which There is No Genuine Issue to be Tried (Docket No. 78) ("DF") and Exhibits thereto ("Defs.' Ex. ——"); (2) Defendant's Response to Plaintiff's LR 56.1 Concise Statement of Material Facts (Docket No. 85) ("DR"); (3) the Supplemental Statement of Facts in Opposition to Plaintiffs' Partial Motion for Summary Judgment (Docket No. 84) ("DSF") and Exhibits thereto ("Defs.' Supp. Ex. ——"); (4) Plaintiff's LR 56.1 Concise Statement of Material Facts (Docket No. 73) ("PF"); (5) Exhibits attached to Plaintiff Jennifer Yerardi's Motion for Partial Summary Judgment (Docket No. 72) ("JY Ex. ——"); and (5) Plaintiffs' Counterstatement of Material Facts (Docket No. 88) ("PC") and Exhibits attached thereto ("Pls.' Ex. ——"). In addition, and to the extent the information is not included in the above-referenced pleadings, the facts are derived from the Affidavit of Daniel R. Deutsch (Docket No. 71) ("Deutsch Aff.") and Exhibits thereto ("Deutsch Ex. ——"), the Affidavit of Jennifer Yerardi (Docket No. 70) ("Ms. Yerardi Aff.") and Exhibits thereto ("Ms. Yerardi Aff., Ex. ——"), and the Affidavit of Joseph Yerardi (Docket No. 86) ("Mr. Yerardi Aff.") and Exhibits thereto ("Mr. Yerardi Aff., Ex. ——").

purchased a residential property for $1,300,000 that was located at 134 Chestnut Hill Road in Newton, Massachusetts, and contained a turn-of-the-century stone house, as well as a pool house (the "Property"). (PF ¶¶ 2, 12; DF ¶ 5). The title to the Property was in Jennifer Yerardi's name exclusively, and has never been in her husband's name. (PF ¶ 2). According to Ms. Yerardi, she intended to renovate the Property, which was in disrepair, and to move into it with her family. (PF ¶ 4). However, there is evidence in the record indicating that she intended to use the Property for investment purposes. (Ex. 6 to Defs.' Ex. B).

In connection with her purchase of the Property, Jennifer Yerardi obtained a $750,000 loan from Old Kent Mortgage Company ("Old Kent"). (DF ¶ 6). The loan was secured by a first mortgage on the Property. (*Id.*). Sometime thereafter, Boston Federal acquired Old Kent's interest under the promissory note from Ms. Yerardi. (*Id.*).

### The 2001 Insurance Policy

The plaintiffs sought homeowner's insurance for the Property through Thomas Walsh, an insurance broker at what is now known as Sico & Walsh Insurance Agency. (DF ¶ 24; PF 6). Mr. Walsh communicated exclusively or almost exclusively with Mr. Yerardi regarding the plaintiffs' insurance coverage matters, and has met Ms. Yerardi only in passing, if at all. (PF ¶ 6). Mr. Walsh prepared an insurance application based on information that he obtained from Mr. Yerardi, and submitted it to Surplus Services Insurance Agency ("Surplus Services") of Newton, Massachusetts. (DF ¶ 25–26). On the application, Mr. Walsh wrote that the "[h]ouse will be under renovation for 6 months" and that the "[h]ouse has central station fire and burglar alarm." (*Id.* ¶ 27; Homeowner Application contained in Ex. 2 to Defs.' Ex. E).

Mr. Walsh obtained this information from Mr. Yerardi. (DF ¶ 27).

Surplus Services issued an insurance binder, effective June 29, 2001, on behalf of Chubb & Sons providing temporary insurance coverage for the dwelling on the Property in the amount of $2,000,000, with a $10,000 deductible. (DF ¶ 28; Ex. 4 to Defs.' Ex. E). The binder listed both Joseph and Jennifer Yerardi as the insured and listed Chubb & Sons as the insurance company. (Ex. 4 to Defs.' Ex. E). Under the heading "Special Conditions/Other Coverages," the binder read, "Term 6/29/01–02 Prem $3498. require contractors cert, fire extinguishers visible on all floors, fencing around site & active central station fire & burglar alarms." (DF ¶ 29; Ex. 4 to Defs.' Ex. E).

One issue in this case is whether the presence of an active central station alarm system was a condition precedent to recovery under the insurance policy and whether the Yerardis intentionally concealed or made misrepresentations to their insurer concerning the existence of such a system at the Property. A central station alarm system is a burglar or fire alarm system that is connected to a central station, which is alerted of a fire or break-in and notifies the proper authorities. (DF ¶ 50). It operates through phone lines. (*Id.*). Mr. Walsh discussed this and the other policy requirements with Mr. Yerardi. (DF ¶¶ 30–31).

After the binder issued, the Yerardis obtained a homeowner's insurance policy for the Property that was effective June 29, 2001 to June 29, 2002 (the "2001 Policy"). (DF ¶ 19; Defs.' Ex. D). Both Joseph and Jennifer Yerardi were named insureds under the 2001 Policy, which provided coverage for the house on the Property in the amount of $2,000,000, with a $10,000 base deductible for each occurrence. (DF ¶¶ 20, 21; Defs.' Ex. D). Old

Kent was named as the mortgagee and listed on the 2001 Policy as an "additional interest." (DF ¶ 22; Defs.' Ex. D).

### The Central Station Alarm Requirement

On about August 8, 2001, Surplus Services sent a memorandum to the insurance broker, Mr. Walsh, in which it stated that it needed certain information by September 10, 2001 or the Yerardis' 2001 Policy would be marked for mid-term cancellation. (DF ¶ 32; Ex. 5 to Defs.' Ex. E). The necessary information included "contractor's certificates of liability in the amount of at least $2,000,000 showing the insured as the certificate holder," and "verification that fire extinguishers have been placed in visible, accessible locations on each level of the dwelling." (*Id.*). The memorandum further read, "[p]lease note these were conditions on the binder." (*Id.*). After discussing these requirements with Joseph Yerardi, Mr. Walsh wrote a response to the memorandum in which he stated in relevant part:

> The insured says that there are fire extinguishers on all floors as well as a central station fire and burglar alarm. The insured has not started work on the interior of the house. Estimated start time is 11/01/01. He will provide us with a certificate at that time.

(*Id.*). Mr. Walsh obtained this information from Mr. Yerardi. (DF ¶ 34).

The evidence shows that the Property contained a central station alarm when Ms. Yerardi purchased it in June 2001. (DF ¶ 50). Nevertheless, the defendants contend that the plaintiffs deceived them into believing that the system was active when it was not. (Defs.' Mem. at 13). It is undisputed that the prior owner had an active alarm system monitored by American Alarm Company. (DF ¶ 51). It is not clear whether the system remained active after Ms. Yerardi purchased the Property in June 2001, and, if so, for how long.

Specifically, the record establishes that the last active alarm signal that American Alarm received from the Property was in July 2001. (DF ¶ 52). In August 2001, the Property was inspected by Amanda Bacon, who identified herself to Mr. Yerardi as a Chubb representative. (PC ¶ 2). According to the plaintiffs, Ms. Bacon asked to see the utility room, and told Mr. Yerardi that a panel located there contained the alarm system for the house. (*Id.*). Ms. Bacon's inspection report indicated that there was an adequate central alarm security system, for fire and burglary detection, that the monitoring company was American Alarm, and that no maintenance agreement was required. (*Id.* ¶ 3; Pls.' Ex. B). The report also indicated that security at the Property was "below average" as it was vacant and under renovation. (Pls.' Ex. B).

Also in August or September 2001, both of the plaintiffs were at the Property when some curtains caught on fire. (PC ¶ 4). According to the plaintiffs, as they extinguished the fire, a whooping alarm sounded throughout the house and the system announced "fire in the living room" or "fire in the great room" before stopping within one or two minutes. (*Id.*). Thus, they contend, they believed the alarm systems were active at that time. (*See* PC ¶¶ 4–5).

There is evidence in the record that, effective April 25, 2002, the previous owners of the Property cancelled the monitoring services that the American Alarm Company had provided for the system. (DF ¶¶ 51, 52). Subsequently, Robert Bushinsky, a sales and marketing associate with American Alarm, attempted to contact the Yerardis in order to arrange for the service to continue. (*Id.* ¶ 53). Mr. Bushinsky left a number of messages on the plaintiffs' home voicemail. (*Id.*). Ad-

ditionally, he spoke with Mr. Yerardi on one occasion. (*Id.*; Defs.' Ex. H at 46–47). Mr. Yerardi said that his wife handled the alarm system and that he would give her the message. (*Id.*). Mr. Bushinsky never heard from Ms. Yerardi, and the service was not reinstated. (*Id.*). It is undisputed that the Yerardis had never paid for or deactivated the alarm service. (DF ¶ 56).

The Yerardis claim that the alarm system could not have been monitored in any event due to the status of construction at the Property during the winter of 2001 and the spring of 2002. In particular, in the spring of 2002, at about the same time when Mr. Bushinsky first was attempting to contact the Yerardis, the house was undergoing extensive renovations, and some areas of the house such as windows and doorways remained open to the elements. (PC ¶ 6). According to Mr. Bushinsky, a house in that condition cannot be monitored reliably, and American Alarm does not monitor homes under construction until they are fully enclosed. (*Id.*; Pls.' Ex. C at 62).

### Engagement of a Caretaker

Another issue in this matter is whether the plaintiffs misrepresented material facts regarding their engagement of a caretaker for the Property, and whether the presence of a caretaker or security guard was a condition precedent to continued coverage under the homeowner's policy. (Defs.' Mem. at 13–14). In November 2001, Mr. Walsh received a memorandum from Surplus Services informing him that Chubb had recently conducted an inspection and appraisal of the Property. (DF ¶ 35; Ex. 11 to Defs.' Ex. E). Therein, Surplus Services informed Mr. Walsh that coverage for the dwelling on the Property would need to be increased to $3,749,000 in order to cover the replacement cost, that there would be an additional premium, and that Chubb would increase the coverage if it

did not receive a response by November 12, 2001. (Ex. 11 to Defs.' Ex. E). Additionally, the memorandum provided:

> The following requirements will need to be met in order for the Company to remain on the risk:
>
> 1. A Security guard or caretaker is recommended to watch over the home in the evening and weekend hours when the workers are not there. This will reduce the likelihood of vandals or thieves on the property. In addition, it will assist in the early detection of a fire.

(*Id.*). There were no further specifications regarding the security guard or caretaker requirement. (Defs.' Ex. E at 85). Moreover, there was no reference to the need for any alarm system.

Mr. Walsh spoke with Mr. Yerardi about the increased value of the building, the potential increase in the premium and the need for a security guard. (DF ¶ 37). Jennifer Yerardi also knew that she was required to provide security on nights and weekends in order to maintain coverage for the Property. (*See* PF ¶ 9; DSF ¶ 6). Nothing was apparently done until April 2002. Around that time, Mr. Walsh received a telephone call from Surplus Services regarding the status of the security guard and informing him that a notice of nonrenewal was being sent due to the lack of a guard. (DF ¶ 38; Ex. 11 to Defs.' Ex. E). Mr. Walsh conveyed this information to Mr. Yerardi who agreed to provide a security guard. (*Id.*). Mr. Yerardi then notified Mr. Walsh, by letter dated April 15, 2002, that "as per your request I have put in place a caretaker for nights and weekends." (Ex. 13 to Defs.' Ex. E). Mr. Walsh faxed this letter to Surplus Services. (DF ¶ 39). By this time, however, Pacific had issued a notice of nonrenewal, dated May 20, 2002, for "failure to comply with critical recommendations from the ap-

praisal." (DF ¶ 40; Ex. 14 to Defs.' Ex. E).

Nevertheless, after receipt of Mr. Yerardi's letter, Pacific renewed the 2001 Policy for a further one year term. (DF ¶ 41). However, the coverage was never increased to reflect the replacement value of the house as Chubb had previously indicated. (PF ¶ 14).

The caretaker for the Property was Jennifer Yerardi's close friend, Maureen Navarro. (DF ¶ 43; PF ¶ 9). Ms. Navarro lived in Douglas, Massachusetts and worked as a bartender/waitress at a restaurant in Waltham, Massachusetts. (DF ¶ 44). She also had worked as a private investigator for over ten years, but had never conducted surveillance on an unoccupied building. (DF ¶ 47; PC ¶ 12). The Yerardis did not pay Ms. Navarro for her services. (DF ¶ 45). However, Ms. Navarro owed the Yerardis approximately $20,000 from a loan that she had been unable to repay, and she felt that checking on the Property was the least she could do. (DF ¶ 46; Defs.' Ex. G at 56).

Generally, Ms. Navarro drove by the house twice each day, once in the early evening and again sometime prior to midnight. (DF ¶ 48). Her visits lasted about five minutes, and she rarely got out of her car and did not drive onto the Property. (*Id.*). She did not keep a log or report the results of her surveillance to the Yerardis. (*Id.* ¶ 49). However, she contends she visited the Property every day from mid-April 2002 until the day of the fire. (PC ¶ 12; Defs.' Ex. G at 44).

### Additional Financing

As detailed above, the Property was purchased with the proceeds of a $750,000 loan. (DF ¶ 6). On September 13, 2001, Ms. Yerardi obtained a $750,000 construction loan from Atlantic Bank of New York ("ABNY") in order to finance renovations to the stone house on the Property. (DF ¶ 7). This loan was secured by a second mortgage on the Property. (*Id.*). It had a term of one year, and required payment of interest only over the 12 month life of the loan, with the principal balance due at maturity. (*Id.* ¶ 8; Ex. 6 to Defs.' Ex. B). The 2001 Policy was updated in September 2001 to add ABNY as a mortgagee having an additional interest in the Property. (DF ¶ 23).

ABNY approved the loan based in part on personal and corporate financial information that the Yerardis submitted to the bank. (DF ¶¶ 9, 10, 14). In particular, ABNY relied on Ms. Yerardi's personal financial statement, federal income tax returns for Jennifer and Joseph Yerardi, and federal income tax returns for Yerardi Industries, Inc. (*Id.* ¶¶ 9–14). As detailed below, however, much of this financial information later turned out to be false.

In May 2002, the plaintiffs obtained a thirty-day loan in the amount of $105,000 from the RMB Card Realty Trust. (DF ¶¶ 15, 16). Repayment of the loan was due on June 10, 2002. (*Id.* ¶ 17). Nevertheless, the plaintiffs did not repay the loan on June 10 or at any time prior to the October 2002 fire at the Property. (*Id.* ¶¶ 17, 18).

### 2002 Renewal of the Homeowner's Insurance Policy

In June 2002, the Yerardis' homeowner's insurance policy was renewed for an additional one-year term. (DF ¶ 41; Defs.' Ex. F). Joseph and Jennifer Yerardi were named as the insureds under the renewal policy (the "2002 Policy"), which provided $2,140,000 of coverage for the house, with a $10,000 base deductible.[2] (Defs.' Ex. F).

---

**2.** The 2002 Policy, like the policy that was issued in 2001, also provided personal liability coverage of $1,000,000. (Defs.' Exs. D and F). The provisions of the 2002 Policy pertain-

The 2002 Policy also provided $428,000 of coverage for "other permanent structures on the grounds of your house." (PF ¶ 20; Defs.' Ex. F at B–4). Both Old Kent and ABNY were listed as mortgagees having an additional interest under the 2002 Policy. (Defs.' Ex. F at 5).

The "Deluxe House Coverage" portion of the 2002 Policy contained a list of Exclusions. (*Id.* at B–7 through B–9). Of significance to this case is the exclusion for "intentional acts," which provided, "[w]e do not cover any loss caused intentionally by you or a family member, or by a person directed by you or a family member to cause a loss. An intentional act is one whose consequences could have been foreseen by a reasonable person." (*Id.* at B–9). "You" is defined as "the person named in the Coverage Summary, and a spouse who lives with that person." (*Id.* at A–1).

Additionally, the portion of the 2002 Policy entitled "Policy Terms" explained the conditions that applied to the Policy. (*Id.* at Y–1). The general conditions included, in relevant part, the following language:

**Concealment or fraud**

We do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss.

**Application of coverage**

Coverage applies separately to each covered person. However, this provision does not increase the amount of coverage for any one occurrence.

(*Id.*). Moreover, the special conditions provision pertaining to mortgagees or loss payees provided:

If we pay the mortgagee or loss payee for any loss and deny payment to you, then:

• our rights are subrogated to all rights of the mortgagee or loss payee granted under the mortgage on the property; or

• at our option, we may pay to the mortgagee or loss payee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer from the mortgagee or loss payee and all securities held as collateral to the debt.

(*Id.* at Y–5).

### *The Yerardis' Dispute with the Historic Commission*

During the Summer of 2002, the Yerardis were forced to stop renovation work at the Property due to a dispute with the Chestnut Hill Historic Commission ("Commission"). (Defs.' Ex. K at 145–46). The Commission, which was responsible for approving all of the exterior renovations at the Property, became aware that the Yerardis had constructed a two story addition to the house instead of a one story addition as had been described in the approved plan. (DF ¶¶ 59–60; Defs.' Ex. L at 42–43). After considering the revised addition at a meeting on July 18, 2002, the Commission issued a Record of Action, dated July 23, 2002, disapproving the Certificate of Appropriateness for the second floor addition. (DF ¶ 61; Defs.' Ex. L at 42–43; Ex. 12 to Defs.' Ex. L).

The Yerardis appealed the Commission's Record of Action. (DF ¶ 62). On September 20, 2002, a review panel of the Metropolitan Area Planning Council issued a decision remanding the matter to the Commission for a rehearing at which the Yerardis would have the opportunity to present the project to the Commission again or to present a revised plan of the project.

---

ing to personal liability are not at issue in this litigation.

(*Id.* ¶ 63; Ex. 16 to Defs.' Ex. L). Construction could not resume without the Commission's approval. (DF ¶ 63). The Yerardis did not submit new plans to the Commission and no rehearing occurred prior to the fire at the Property. (DF ¶¶ 64, 65). Moreover, renovation work did not resume at the Property prior to the date of the fire. (DSF ¶ 19).

### Notice of Default on the ABNY Loan

Another issue that arose in the Summer of 2002 concerned the Yerardis' failure to make payments on Ms. Yerardi's loan from ABNY. On July 17, 2002, approximately two months prior to the date when the ABNY loan was to mature, ABNY sent Jennifer Yerardi a letter notifying her that her loan was in default due to her failure to make three interest payments totalling over $16,000. (Exs. 3 and 4 to Defs.' Ex. M). Thereafter, the Yerardis attempted to negotiate a resolution with ABNY, and ABNY agreed to forbear from taking legal action against Jennifer Yerardi if she was able to meet certain conditions, including bringing her interest payments current by October 24, 2002, renewing her promissory note to ABNY on terms acceptable to the lender, and providing certain financial documents and information to ABNY by October 31, 2002. (Pls.' Ex. G; DF ¶ 72). ABNY further advised the Yerardis that "if the parties cannot reach an agreement on the terms of a renewed Note by November 14, 2002, ABNY will pursue all legal remedies provided for under the existing loan documents and Massachusetts law, including an action on the Note and foreclosure on the property." (DF ¶ 73; Pls.' Ex. G).

The fire which occurred at the Property took place prior to November 14, 2002. As of the date of the fire, the Yerardis had not reached an accommodation with ABNY or become current on the loan, which remained in default. (DF ¶¶ 74–76). ABNY had not yet initiated any foreclosure action against Jennifer Yerardi. (PC ¶ 14).

### The October 23, 2002 Fire

On October 23, 2002, sometime in the early morning, a fire broke out in the main house on the Property, causing extensive damage to the house and the pool house. (DF ¶¶ 79, 80; PF ¶ 10). After conducting an investigation, the State Fire Marshal's office determined that "the cause of the fire was incendiary/arson by the deliberate application of an open flame to ignitable liquid." (Ex. 1 to Defs.' Ex. N; DF ¶ 81). According to Trooper Arakelian, who headed the investigation, the investigators concluded that gasoline had been poured on the first floor of the northern part of house and had leaked into the basement. (DF ¶ 81; Defs.' Ex. N at 48–50, 53).

During the investigation, Trooper Arakelian determined that the house was not secured and that access to the house could be gained from the new addition, which had no doors or windows in place. (DF ¶ 82; Defs.' Ex. N at 39–40). He also determined that there was no security system, no fire extinguishers, no fire alarm system, and no smoke detectors. (DF ¶¶ 83–84). Trooper Arakelian did observe a cut red wire in the staircase from the basement to the first floor. (*Id.* ¶ 83). This indicated that there had been a fire alarm system, but that it had been disconnected. (*Id.*).

### The Plaintiffs' Claim for Coverage

In February 2003, the Yerardis submitted proofs of loss in which they claimed coverage under the 2002 Policy in the amount of $2,140,000 for the main house and $37,000 for the pool house, less than the full amount of coverage on the pool house. (PF ¶ 12). Additionally, Boston Federal and ABNY submitted claims as loss payees under the 2002 Policy. (DF ¶ 86). Pacific paid $762,928.43 to Boston

Federal and $823,661.69 to ABNY, and took a full assignment of those mortgages pursuant to the terms of the 2002 Policy provisions concerning mortgagees and loss payees. (DF ¶ 87; Ms. Yerardi Aff., Ex. 2 at 3). Pacific is seeking reimbursement of these amounts from the plaintiffs in this action. (Am. Answer (Docket No. 54) at pp. 22–27).

### Investigation of the Claim and Denial of Coverage

The Yerardis commenced suit against the defendants on March 19, 2003 in state court, which action was removed to this court on April 25, 2003. (*See* Docket No. 5 (State Court Record)). The defendants conducted an investigation in connection with the Yerardis' claim for coverage and in connection with the Yerardis' legal action. The investigation continued until at least March 18, 2004, when, as discussed *infra*, coverage was formally denied by Pacific, pursuant to a letter signed by a Vice President of Chubb, a division of Federal. (Ms. Yerardi Aff. Ex. 2). Among the issues raised in this litigation is whether the Yerardis, during the investigation, intentionally concealed or misrepresented material facts that pertained to their financial condition at the time of the fire, the threatened foreclosure by ABNY, the status of the dispute over the Commission's approval of the renovation work, and the amount of coverage that was available under the 2002 Policy.

In response to Pacific's request for documents, the Yerardis produced copies of what appeared to be unsigned joint federal tax returns for the years 1999, 2000, and 2001, as well as copies of what appeared to be signed and unsigned federal tax returns for Yerardi Industries, Inc. for the years 1999, 2000, and 2001. (DF ¶¶ 88, 89; Defs.' Exs. O and P). Several of the returns listed "Edward Murray" of "9 Cabrey Avenue, Sharon, MA" as the paid tax preparer. (Defs.' Exs. O and P). Additionally, the plaintiffs produced what appeared to be a signed personal financial statement for Jennifer Yerardi showing, among other things, that she had assets of almost $5 million, a total annual income of $490,000, total annual expenses of $219,000, and no tax obligations past due. (Defs.' Ex. Q).

These documents did not accurately reflect the Yerardis' true financial condition. Both Joseph and Jennifer Yerardi testified in depositions that they had not filed personal tax returns with the Internal Revenue Service ("IRS") in about three years.[3] (Defs.' Ex. K at 104; Defs.' Ex. T at 119). Additionally, Joseph Yerardi testified that none of the Yerardi Industries returns that had been produced had been filed with the IRS, that the plaintiffs' individual tax returns had been prepared in order to obtain the ABNY bank loan, and that he did not know if any of the tax returns that had been produced to the defendants were accurate. (Defs.' Ex. K at 88, 90, 99, 104, 108, 111–12). Furthermore, Mr. Yerardi was unable to identify the Edward Murray who was listed as the tax preparer on the returns. (DF ¶ 96).

The Yerardis also testified that Mr. Yerardi had prepared the personal financial statement, which had been submitted to ABNY on behalf of Ms. Yerardi. (*Id.* ¶¶ 97, 98). Mr. Yerardi also admitted that the statement contained false or inaccurate information. (*Id.* ¶ 99). For example, he

---

**3.** Since her deposition, Jennifer Yerardi has filed individual federal tax returns with the IRS for the years 2000 through 2003. (DF ¶ 110; Exs. attached to Defs.' Ex. R). The returns that Ms. Yerardi filed show substantially lower adjusted gross income than the purported joint returns that the plaintiffs produced to the defendants. (DF ¶¶ 111–13; Defs.' Ex. O; Exs. attached to Defs.' Ex. R).

testified that his wife had never been President of Yerardi Industries, Inc., contrary to what was stated in the financial statement. (*Id.* ¶ 99; Defs.' Ex. K at 55–56). He also testified that the number of the marketable securities listed in the statement had come "out of my ass," and that he had not verified the $210,000 figure that he had written on the statement as Ms. Yerardi's annual salary, bonuses and commissions. (Defs.' Ex. K at 59–60, 70–71). Furthermore, although the Yerardis had neglected to file a number of personal and corporate tax returns with the IRS, the financial statement indicated that there were no tax obligations past due. (DF ¶¶ 92, 94, 103; Defs.' Ex. J at 126–27). The plaintiffs contend that they did not expect the defendants to rely on any of these documents. (*See* PF ¶ 15).

The defendants also assert that the plaintiffs misrepresented the status of their disputes with ABNY and the Historic Commission. During the investigation, Mr. Yerardi testified that he had stopped making payments on the ABNY loan because $25,000 had "mysteriously disappeared" from an account that Ms. Yerardi had at ABNY, and Mr. Yerardi was unwilling to make payments on the loan until the bank returned the money. (DF ¶ 78; Defs.' Ex. K at 310–11). He also maintained that the issues with ABNY had been resolved or were being resolved prior to the day of the fire. (DF ¶ 77; PC ¶ 17). Nevertheless, as detailed above, it is undisputed that the loan had not been made current and a settlement arrangement had not been agreed upon as of the date of the fire.

With respect to the dispute with the Historic Commission, Ms. Yerardi testified that it was her understanding that at the rehearing that was scheduled to take place after the date of the fire, the Yerardis were going to get the "go-ahead" to re-sume work at the Property. (DF ¶ 67). She further testified that new plans were to be submitted to the Commission before then. (*Id.*). Mr. Yerardi testified that the Commission had granted permission to resume work about a week before the fire. (*Id.* ¶ 66). As detailed above, this was not true.

Finally, another issue in dispute is whether the Yerardis knowingly sought to mislead the defendants regarding the amount of coverage available under their homeowner's policy. In December 2003, the plaintiffs submitted a "Coverage Summary Renewal" page purporting to provide homeowner's insurance coverage for the Property in the amount of $4,140,000. (*Id.* ¶ 115). Each of the plaintiffs testified that the document had been found in a box containing insurance-related documents. (*Id.* ¶ 116). The plaintiffs claimed, at their examinations under oath, that based on the information contained in the document, they are entitled to $4,140,000 in coverage under the terms of their homeowner's policy for the loss sustained as a result of the fire. (*Id.*). The defendants contend that the "Coverage Summary Renewal" is fake and that the coverage limit was never increased to $4,140,000. (*Id.* ¶¶ 115, 119).

### Denial of the Yerardis' Claim

In a letter dated March 18, 2004, Chubb advised the Yerardis that Pacific had substantially completed its investigation of their claim, and had determined that it had no liability to them. (Ms. Yerardi Aff., Ex. 2). Chubb further advised the Yerardis that their claim was being denied in its entirety for the following reasons:

Your policy provides as follows:

*Intentional Acts.* We do not cover any loss caused intentionally by you or a family member, or by a person directed by you or a family member to cause a loss. An intentional act is one whose

consequences could have been foreseen by a reasonable person.

Our conclusion, after investigating the October 23, 2002 fire is that it was set by you or at your direction with your knowledge and consent and for your benefit, thus coverage for the fire loss is excluded by this provision of the policy. Your policy also contains the following provisions:

*Concealment or Fraud.* We do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss.

Pacific's investigation disclosed that you misrepresented and concealed material facts relating to the fire loss, including but not limited to, the cause of loss, the circumstances leading up to the loss, the nature and extent of the loss and your financial condition at or about the time of loss.

Pacific's investigation disclosed that you misrepresented and concealed material facts and submitted false and fraudulent documents in an attempt to mask the true nature of your financial condition to make it appear that it was better than it actually was and convince Pacific that you had no financial motive to cause the fire. The false and fraudulent documents included phony tax returns and a phony financial statement for Jennifer Yerardi. Among other things, you also misrepresented and concealed the true status of your child support obligations, the status of mortgage payments prior to the fire and your knowledge of the second lender's threat of foreclosure prior to the fire.

Pacific's investigation further disclosed that you submitted a false and fraudulent document and misrepresented and concealed your knowledge about the coverage under the policy in an effort to inflate the amount of the intentional loss. The document you submitted titled "coverage summary renewal" effective June 29, 2002, reflecting building limits of $4,140,000 and personal liability limits of $3,000,000 was prepared by you or at your direction in furtherance of your attempt to defraud Pacific. The actual policy limit on the building at the time of loss was $2,140,000 and $1,000,000 for personal liability. The original and correct coverage summary was altered by you or at your direction. Further misrepresentations and concealments include, but are not limited to: the status of the stop work order issued by the Town of Newton at the time of the fire; your financial dealings with the Commonwealth of Massachusetts; your dealings with the registry of motor vehicles and various lenders and creditors, and the presence of a caretaker at the property location on nights and weekends, all in breach of the above-referenced policy provision.

Because you have breached the above-referenced concealment or fraud provision of the policy, there is no coverage for the loss and your claim is denied in its entirety.

(*Id.*).

The Yerardis deny the truth of these accusations and claim instead that the defendants are liable to them. (*See* PF ¶¶ 15–22). They contend that they accurately disclosed their understanding of the status of their affairs, and deny creating the disputed insurance document. (PF ¶¶ 13, 16–22). The Yerardis further contends that they did not expect the defendants to rely on the incorrect financial information, but rather, simply produced all the documents in their possession in response to document requests. (PF ¶ 15).

Additional facts will be provided below where appropriate.

### III. ANALYSIS—DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### A. Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant ... would permit a rational fact finder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted). In order to defeat the entry of summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (internal citations and quotations omitted). In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." *Galloza v. Foy*, 389 F.3d 26, 28 (1st Cir.2004) (internal citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir.2001). "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56." *Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc.*, 761 F.Supp. 194, 197–98 (D.Mass.1991).

#### B. Fraud Claims

The defendants are seeking summary judgment on Count I of the First Amended Complaint in which the Yerardis assert a claim of breach of contract for failure to pay under the policy and on Count 4 of the defendants' Counterclaim, wherein the defendants claim that the Yerardis breached the contract by misrepresenting material facts.[4] Specifically, the defendants claim that the Yerardis "misrepresented material facts regarding their compliance with conditions precedent to the issuance of the Policy, including whether the Property had an active central station alarm and a caretaker or security guard. Had Plaintiffs told Pacific the truth about their compliance, Pacific would not have issued a policy to Plaintiffs." (Defs.' Mem. (Docket #77) at 11–12). In addition, the defendants contend that they were entitled to decline coverage because the Yerardis misrepresented material facts during Pacific's investigation of the plaintiffs' claim, including facts concerning their financial condition at the time of the arson, the status of the ABNY loan, their ability to make reno-

---

**4.** While the defendants contend they are seeking summary judgment on Count 3 of their Counterclaim, they refer to it as a breach of contract claim. Count 4 of the Counterclaim is for breach of contract.

vations to their house, and the amount of coverage under the Policy. (*Id.* at 17). For the reasons detailed herein, there are disputed facts precluding the entry of summary judgment on these claims.

### 1. *Conditions Precedent*

■ The defendants assert that the requirement of an active central alarm system and the hiring of a caretaker or security guard to monitor the Property were conditions precedent to the issuance of the Policy, and that the Yerardis lied about their compliance with these conditions. Where "full, complete, and true answers were conditions precedent to the [insurer's] liability," misrepresentations will relieve the insurer of any obligation to provide coverage. *See Mass. Mut. Life Ins. Co. v. Sullivan,* 5 Mass.App.Ct. 816, 361 N.E.2d 1321, 1322 (1977) (rescript). Thus, a critical issue is "whether the language of the policy rendered the accuracy of the plaintiff's answers on the proposal a condition precedent, or whether those answers were merely warranties[.]" *Kobico, Inc. v. Pipe,* 44 Mass.App.Ct. 103, 105, 688 N.E.2d 1004, 1006 (1997).

■ The question whether policy language creates a condition precedent or a warranty is a question of law for the trial judge to decide. *Id.* at 106, 688 N.E.2d at 1007. A statement may become a condition of the policy if "(1) the statement made by the insured relates essentially to the insurer's intelligent decision to issue the policy; and (2) the statement is made a condition precedent to recovery under the policy, either by using the precise words 'condition precedent' or their equivalent." *Id.* (quoting *Charles, Henry & Crowley Co. v. Home Ins. Co.,* 349 Mass. 723, 726, 212 N.E.2d 240, 242 (1965)). "Equivalent" language may include policy provisions which state "in no uncertain terms that misrepresentations would result in a voiding of the

policy." *Kobico,* 44 Mass.App.Ct. at 106–07, 688 N.E.2d at 1007, and cases cited.

■ In the instant case, the undisputed facts establish that in the June 29, 2001 binder, under the heading "Special Conditions/Other Coverages," the insurer required "active central station fire and burglar alarms." (DF ¶ 29; Ex. 4 to Defs.' Ex. E). However, there is no express reference to this being a "condition precedent" or any other comparable language. Additionally, the 2001 Policy documents submitted by the defendants contain no mention of the need for an alarm system. (Defs.' Ex. D). In fact, the Policy documents themselves indicate that the insurer believed there was no fire alarm present in the house when the 2001 Policy was issued. (Rate Sheet set forth in Defs.' Ex. D). Moreover, in Surplus Services' memorandum of August 8, 2001, it referenced only the need for "contractor's certificates of liability" and "verification that fire extinguishers have been placed in visible, accessible locations on each level of the dwelling" as the conditions in the binder which needed to be met in order to prevent cancellation of the policy; there is no mention of the need for an alarm system. (DF ¶ 32; Ex. 5 to Defs.' Ex. E). In light of the uncertainty as to whether an active alarm system can exist in a home under construction, this court cannot conclude as a matter of law that the omission of any reference to the alarm system in the memorandum was unintentional. Absent the "precise words 'condition precedent' or their equivalent," this court does not find that an active burglar and fire alarm system was a condition precedent to the 2001 Policy. Since there was no mention at all of the alarm system in connection with the 2002 Policy, this court also concludes that the system was not a condition precedent to the 2002 Policy.

Even if this court were to conclude that the alarm system was a condition precedent to the 2001 Policy, there are disputed facts as to whether Mr. Yerardi made a material misrepresentation when he told Tom Walsh in about August 2001 that there was "a central station fire and burglar alarm." (DF ¶¶ 32, 34; Ex. 7 to Defs.' Ex. E). There is evidence in the record from which a jury could find that there was an "active" system in place as of that time. Therefore, Pacific's claim for summary judgment on the basis of the status of the alarm system must fail.

■ This court does find that "[a] security guard or caretaker" was a condition precedent to the 2002 Policy. While the insurer's November 2001 memorandum to Surplus merely "recommended" such a guard, in April 2002 the insurer made it clear that, absent a guard, the insurance would not be renewed. (Ex. 11 to Defs.' Ex. E; DF ¶¶ 38–40). This language is sufficiently explicit to constitute a condition precedent.

■ However, there are disputed facts which preclude summary judgment on the basis that Mr. Yerardi's statement of April 15, 2002 that he had "put in place a caretaker for nights and weekends" was a material misrepresentation.[5] (Ex. 13 to Defs.' Ex. E). The insurer did not specify the duties or requirements for a security guard or caretaker. There is evidence from which a jury could conclude that the Yerardis did hire Maureen Navarro and that her hiring was sufficient to satisfy the insurer's requirements. Thus, there are disputed facts which preclude a finding

that the challenged representation was false.

### 2. Misrepresentations During the Investigation

■ The defendants contend that the Yerardis made misrepresentations during the course of Pacific's investigation, including false statements concerning (1) the state of their financial condition, (2) the status of the ABNY loan, (3) the status of the dispute with the Historical Commission, and (4) the creation of a declarations page of the Policy showing coverage of $4,140,000. As a result, Pacific contends, the defendants properly denied coverage. This court finds that while the question is a close one, in particular with respect to the false tax returns and financial statement, there are disputed facts which preclude the entry of summary judgment.

The Policy provides that "[w]e do not provide coverage if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss." (Defs.' Ex. F at Y–1). See also Mass. Gen. Laws ch. 175, § 99 (standard fire insurance policy contains clause that "policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning the insurance or the subject thereof. . . ."). Such a provision is enforceable. See, e.g., Harold J. Warren, Inc. v. Fed. Mut. Ins. Co., 386 F.2d 579, 581–82 (1st Cir.1967) (misrepresentation by adjuster overstating the amount of the loss was wilful, and voided policy); Bockser v. Dorchester Mut. Fire Ins. Co., 327 Mass. 473, 475–79, 99 N.E.2d 640, 640–43

---

**5.** A fact is "material" if it influences the premium, i.e., if "the knowledge or ignorance" of the fact "would naturally influence the judgment of the underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of

the premium." *Employers' Liab. Assur. Corp. v. Vella*, 366 Mass. 651, 655, 321 N.E.2d 910, 913 (1975) (internal quotations and citation omitted). The existence or absence of security would be a material fact.

(1951) (adjuster's knowing overvaluing of loss constituted an attempt to defraud insurer and voids policy).

The misrepresentation must be "material" in order for any adverse consequences to flow. "To be considered material, a statement need not relate to a matter or subject which ultimately proves to be decisive or significant in the ultimate disposition of the claim; rather, it is sufficient if the statement was reasonably relevant to the insurance company's investigation of a claim." *Dadurian v. Underwriters at Lloyd's, London,* 787 F.2d 756, 759–60 (1st Cir.1986) (internal punctuation and citation omitted). While generally a question of fact, "if the facts misrepresented are so obviously important that 'reasonable minds cannot differ on the question of materiality,'" then the issue becomes one of law for the judge. *Parasco v. Pacific Indem. Co.,* 920 F.Supp. 647, 654 (E.D.Pa.1996) (internal citation omitted). That is the situation here. The representations at issue, which relate to the investigation as to the cause of the fire and any motivation the Yerardis may have had in connection with the fire, are material. *See id.* (in arson investigation, inquiries into whether insured property owners were in a stable financial situation were material to the issue of motive).

The misrepresentations, to be actionable, must also have been made wilfully since an "[i]ntent to defraud is not to be presumed and the trier of fact should make all reasonable allowance for lack of knowledge or sound judgment or for honest mistake on the part of the insured as well as for the tendency to believe that which is to one's own interest." *Harold J. Warren, Inc.,* 386 F.2d at 581 (internal punctuation and citation omitted). However, "proof that a party knowingly made a

false statement and that the subject of that statement was susceptible of actual knowledge" may suffice to prove fraudulent intent without more. *Fisch v. Bd. of Registration in Medicine,* 437 Mass. 128, 139, 769 N.E.2d 1221, 1230 (2002).

In the instant case, the Yerardis have an explanation for all their misstatements. Thus, with respect to the tax returns and other false financial documents, Mr. Yerardi contends that he turned over all financial-type material in his possession, and that he readily admitted their fabrication when questioned under oath.[6] While the defendants may be correct that the story presented strains credibility, the veracity of Mr. Yerardi's statements is a question which, nevertheless, is appropriately decided by the jury. *See Dadurian,* 787 F.2d at 762 (since insurer has the burden of proving insured was lying, and the issue involves a determination of credibility, decision should rest with jury even though evidence strongly indicates insured lied).

Similarly, based on the present record, this court cannot conclude as a matter of law that Mr. Yerardi misrepresented his understanding of the status of the ABNY loan, or that Ms. Yerardi misrepresented her understanding as to the status of negotiations with the Historical Commission. They both testified that they disclosed their understanding of the status of these situations, although there is evidence which calls this testimony into question. Again, this is appropriately resolved by a jury.

Finally, the record is unclear who, if anyone, falsified the declarations page. It is clear, however, that plaintiffs' counsel merely inquired about the available coverage, and did not assert that there was $4 million in coverage available. (PC ¶ 21;

---

**6.** This fact distinguishes the instant case from *Parasco,* 920 F.Supp. at 653–55, where mate-

rial misrepresentations were made repeatedly under oath.

Mr. Yerardi Aff., Ex. A). The plaintiffs' claim was limited to the undisputed coverage amount of $2 million. Thus, at this juncture, there are disputed facts concerning the intent to deceive about the amount of coverage.

In sum, there are disputed facts which preclude the entry of summary judgment based on the alleged misrepresentations made by the plaintiffs.

### C. *Defendants' Remaining Claims for Summary Judgment*

#### 1. Claim for Breach of the Implied Covenant *of Good Faith and Fair Dealing*

■ The defendants also have moved for summary judgment on Count II of the First Amended Complaint. In Count II, the plaintiffs allege that the defendants' conduct, "including their delays, concealment of relevant facts, redundant and extraordinary demands for information, incomplete investigation, and inadequate denial of coverage, constitutes a breach of the covenant implied in the contract to exercise good faith and deal fairly with the Yerardis." (Am.Comp.¶ 44). The plaintiffs have presented no facts to show that the defendants' handling of their claim was unreasonable or was not conducted in good faith. Consequently, the defendants are entitled to summary judgment on Count II of the First Amended Complaint.

"[T]he rule is clear in Massachusetts that every contract is subject to an implied covenant of good faith and fair dealing." *Anthony's Pier Four, Inc. v. HBC Assoc.,* 411 Mass. 451, 473, 583 N.E.2d 806, 821 (1991). This implied covenant "provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. . . .'" *Id.* at 471, 583 N.E.2d at 820.[7] Accordingly, the defendants had a duty to act in good faith and deal fairly with the Yerardis with respect to the 2002 Policy, and could not take any action that would harm the plaintiffs' right to coverage.

There is no evidence that the defendants' conduct lacked good faith. The evidence shows that the fire at the Property was caused by arson. (DF ¶ 81). Thus, the defendants had a good faith basis for conducting an investigation of the Yerardis' claim in order to determine whether the plaintiffs had a motive to commit the arson. The evidence further shows that the defendants conducted a thorough investigation, which included taking testimony from the plaintiffs and numerous additional witnesses, and gathering documents relevant to the Yerardis' claim and the fire loss. (Defs.' Exs. A through W). There is nothing in the record to suggest that the investigation was either insufficient or overzealous, nor is there evidence that the Yerardis were not provided with a full opportunity to support their coverage claim. In fact, the plaintiffs do not argue otherwise. Therefore, the undisputed facts establish that the defendants' actions were reasonable and were not taken for

---

7. The defendants rely on *deVries v. St. Paul Fire & Marine Ins. Co.,* 716 F.2d 939 (1st Cir.1983) to support their contention that "an insurer is found to have violated the covenant of good faith and fair dealing only if its conduct 'amounted to a *calculated and not inadvertent* unreasonable denial of payment.'" Defs.' Mem. at 22–23 (quoting *deVries, 716* F.2d at 942). However, the language quoted in *deVries* was from a jury charge applying New Hampshire law, and there appears to be no Massachusetts decision adopting similar language to express the obligation of good faith and fair dealing. As the *deVries* court held, "reasonableness is the touchstone for determining whether an insurer has breached its obligation of good faith and fair dealing." *Id.* at 943.

the purpose of depriving the Yerardis of the fruits of their contract. Accordingly, the motion for summary judgment on Count II is allowed.

### 2. *Claim of Unfair and Deceptive Practices*

 The Yerardis allege, in Count III of their First Amended Complaint, that the defendants' conduct

> constitutes unfair or deceptive practices in the conduct of insurance business in Massachusetts, in violation of M.G.L. ch. 93A, §§ 2 and 9 and of c. 176D, § 9[sic] (a), (b), (d), (e), (f), (*l*) and (n), in that defendants misrepresented the coverage limit, failed to respond with reasonable promptness to their insureds' communications, failed to affirm or deny their claims within a reasonable time after the claims were submitted, failed to conduct a reasonable investigation into the possible involvement of a third party in causing the loss, failed to promptly, fairly and equitably settle the claims once liability became reasonably clear, delayed their investigation and response by requiring redundant formal proof of loss forms, and failed to reasonably articulate the factual and legal basis for their conclusion that defendants caused the loss.

(Am.Comp.¶ 48).[8] "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." *Arthur D. Little, Inc. v. Dooyang Corp.,* 147 F.3d 47, 54 (1st Cir.1998) (quoting *Ahern v. Scholz,* 85 F.3d 774, 797 (1st Cir.1996) (citation and internal quotation marks omitted)). Even when the record is viewed in the

light most favorable to the Yerardis, the defendants' conduct is not actionable. Therefore, the defendants' motion for summary judgment with respect to Count III is allowed.

"General Laws c. 93A, § 2(a), states that '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.' General Laws c. 176D, § 3, in turn, prohibits 'unfair or deceptive acts or practices in the business of insurance,'" including the unfair claim settlement practices set forth in § 3(9)(a)-(n). *Bobick v. United States Fid. & Guar. Co.* 439 Mass. 652, 658, 790 N.E.2d 653, 658 (2003) (quoting Mass. Gen. Laws ch. 93A, § 2(a) and Mass. Gen. Laws ch. 176D, § 3). "There is no private cause of action under chapter 176D...." *United States ex rel. Metric Elec., Inc. v. Enviroserve, Inc.,* 301 F.Supp.2d 56, 70 (D.Mass.2003). However, chapter 93A incorporates section 3(9) of chapter 176D, and, therefore, an insurer that has engaged in any of the listed unfair claim settlement practices "by definition, has violated the prohibition in G.L. c. 93A, § 2, against the commission of unfair or deceptive acts or practices." *Bobick,* 439 Mass. at 659, 790 N.E.2d at 658 (quotations and citation omitted). *See also Van Dyke v. St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 675, 448 N.E.2d 357, 360 (1983) (plaintiffs are entitled to relief under chapter 93A, § 9, if their rights were affected by the insurer's violation of chapter 176D, § 3(9)).

In the instant case, the Yerardis are alleging that the defendants' conduct constituted unfair or deceptive practices because they engaged in seven of the unfair claim settlement practices described in

---

8. The court will construe Count III as arising under both the alleged provisions of Mass. Gen. Laws ch. 93A and Mass. Gen. Laws ch. 176D, § 3(9), which lists acts and omissions that constitute unfair claim settlement practices by an insurer.

Mass. Gen. Laws ch. 176D, § 3(9). These include:

(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies ... (d) Refusing to pay claims without conducting a reasonable investigation based upon all available information; (e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear ... (l) Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information ... (n) Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

Mass. Gen. Laws ch. 176D, § 3(9).

The evidence, when viewed in the Yerardis' favor, is insufficient to establish that the defendants engaged in unfair settlement practices with respect to the Yerardis' insurance claim. There is nothing in the record establishing, or even suggesting, that the defendants failed to acknowledge or act reasonably promptly upon the plaintiffs' communications concerning their claim. Likewise, there are no facts indicating that the insurers caused any delay by requiring the Yerardis to make multiple submissions. Therefore, there is no basis for the plaintiffs' claim that the defendants engaged in the acts or omissions set forth

in paragraphs (b) and (l) of chapter 176D, § 3(9).

The Yerardis assert that the defendants misrepresented pertinent facts relating to coverage by "disavowing [their] written commitment to increase coverage limits." (Pls.' Opp. Mem. at 11). The record does not support this claim. There is no dispute that the defendants informed the Yerardis' broker that they were going to increase the coverage on the Property to reflect the replacement value of the house, but then failed to do so. (PF ¶ 14; Ex. 11 to Defs.' Ex. E). However, the 2002 Policy, which constitutes the final contract between the parties, clearly shows the coverage available, as well as the amount of the premium. There simply is no evidence indicating that the defendants misled or intended to mislead the Yerardis regarding the limits of the 2002 Policy or otherwise made a "deliberate misrepresentation of underlying facts that might give rise to a violation of chapter 93A...." *United States ex rel. Metric Elec.*, 301 F.Supp.2d at 70. Consequently, the Yerardis cannot support their claim based on Mass. Gen. Laws ch. 176D, § 3(9)(a).

Equally unavailing is the plaintiffs' assertion that the defendants "fail[ed] to explain in detail [their] assertions of fraud and of arson against the Yerardis[.]" (Pls.' Opp. Mem. at 11). In a letter dated March 18, 2004, Chubb advised the Yerardis of the reasons that their claim was being denied. (Ms. Yerardi Aff., Ex. 2). Therein, Chubb quoted the policy provisions relied upon in denying the claim, and provided a detailed description of the conclusions that Pacific had reached as a result of its investigation of the claim. (*Id.*). Accordingly, the facts show that the defendants provided a "reasonable explanation of the basis in the insurance policy for denying the claim" and did not violate clause (n) of chapter 176D, § 3(9). *Van*

*Dyke,* 388 Mass. at 676 n. 4, 448 N.E.2d at 360 n. 4 (insurer's response was reasonable and did not violate clause (n) where insurer stated that it was denying claim due to "the absence of any reasonably clear liability of the insured's physicians.").

Finally, the evidence is insufficient to support a claim based on the remaining provisions of chapter 176D. As discussed in detail above, there is a genuine dispute regarding the Yerardis' right to recover under the 2002 Policy. "An insurer's obligation to promptly settle under section 3(9)(f) 'does not arise until liability has become reasonably clear.'" *Foisy v. Royal Maccabees Life Ins. Co.,* 241 F.Supp.2d 65, 68 (D.Mass.2002) (quoting *Clegg v. Butler,* 424 Mass. 413, 421, 676 N.E.2d 1134, 1140 (1997) (internal quotations omitted)). Because the defendants' liability still remains uncertain, there is no support for the claim that the defendants' actions violated clause (f). In addition, the evidence shows that the defendants did not violate clause (d). "The plain language of this section of the statute contemplates a situation where the insurer refuses to pay a claim without attempting to verify its legitimacy. Nothing like that happened here." *Michael v. Trustmark Ins. Co.,* 16 Mass. L. Rptr. 245, 2003 WL 21030177 *12 (Mass.Super.Jan.14, 2003). Instead, the record shows that the defendants conducted an extensive investigation which lasted about one year. During that time, the defendants obtained testimony from numerous witnesses, including the Yerardis, and compiled documents relevant to the Yerardis' claim. (Defs.' Exs. A through W). The record also shows that as part of the decision to deny the claim, the insurers relied on the Yerardis' own testimony, as well as on documents submitted by them. Under these circumstances, no reasonable jury could find that the defendants violated chapter 176D, § 3(9)(d) by "[r]efusing to pay claims without conducting a reason-able investigation based upon all available information[.]" Nor could it be found, given the extensive investigation, that the defendants violated clause (e) by failing to render their coverage decision "within a reasonable time after proof of loss statements have been completed."

Where, as here, the "undisputed material facts in the record demonstrate that the plaintiff has no reasonable expectation of proving an essential element of his case" pursuant to chapters 93A and 176D, it is appropriate to dispose of those claims on summary judgment. *Bobick,* 439 Mass. at 659, 790 N.E.2d at 658 (internal quotations and citation omitted). Accordingly, the defendants' motion is allowed with respect to Count III of the First Amended Complaint.

### 3. *Claim for Emotional Distress*

In Count V of their First Amended Complaint, which is labeled "Infliction of Emotional Distress," the plaintiffs allege that the defendants' conduct, "including inarticulate and unsupported accusations of arson and fraud, was undertaken with reckless disregard for the rights of the Yerardis as paying policyholders." (Am. Comp.¶ 58). They further allege that "[i]t was reasonably foreseeable to the defendants that such conduct would cause the Yerardis emotional distress, which it has." (*Id.* ¶ 59). It is not clear whether the plaintiffs are alleging intentional or negligent infliction of emotional distress. In either case, they have failed to present facts necessary to satisfy the elements of their claim, and therefore, the defendants' motion for summary judgment as to Count V is allowed.

In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must prove:

(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.

*Tetrault v. Mahoney, Hawkes & Goldings,* 425 Mass. 456, 466, 681 N.E.2d 1189, 1197 (1997) (quoting *Payton v. Abbott Labs,* 386 Mass. 540, 555, 437 N.E.2d 171, 180 (1982)). Here, no reasonable jury could conclude that the defendants' actions were extreme or intolerable. Whether or not the decision to deny coverage ultimately proves to be correct, the undisputed facts show that the defendants considered the available evidence before them, including the State Fire Marshal's determination that the fire was caused by arson, information concerning the status of the plaintiffs' financial commitments, and Mr. Yerardi's admissions that he prepared and submitted false financial documents, in drawing their conclusions. Moreover, even if the defendants' accusations could be said to have been unreasonable, "[l]iability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions or other trivialities" and it is not even enough that the defendant "intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* (internal quotations and citations omitted). Even when viewed in the worst possible light, the defendants' actions do not satisfy the relevant standard.

In addition, the plaintiffs have presented no evidence demonstrating that they suffered severe emotional distress. In fact, the record is void of any evidence of emotional distress. Accordingly, to the extent that the plaintiffs have asserted a claim for intentional infliction of emotional distress, that claim is dismissed.

■■■■■ Similarly, the Yerardis are unable to support a claim for negligent infliction of emotional distress. "[A] plaintiff in order to recover for negligently inflicted emotional distress must prove the following: (1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton v. Abbott Labs,* 386 Mass. 540, 557, 437 N.E.2d 171, 181 (1982). However, the plaintiffs have not identified any negligent conduct on the part of the insurers. The record shows that the defendants' denial of the Yerardis' claim followed a reasonable investigation into the circumstances of the fire loss, and due consideration of the evidence presented by the Yerardis. The plaintiffs have not argued that any aspect of the defendants' investigation was performed negligently, nor have they presented any facts to support such a conclusion. Moreover, nothing in the record demonstrates that either of the Yerardis suffered physical harm as a result of the defendants' accusations. Therefore, the defendants' motion for summary judgment is allowed with respect to Count V of the First Amended Complaint.

4. **Chubb's and Federal's Motion for Summary Judgment *Based on Lack of Contractual Relationship with the Plaintiffs***

■■■■ Both Chubb and Federal contend that all of the Yerardis' claims against

them should be dismissed on the grounds that the 2001 and 2002 Policies were issued by Pacific alone, and neither Chubb nor Federal had any contractual relationship with the plaintiffs. However, this court finds that there is a genuine issue of fact concerning Chubb's and Federal's contractual obligations to the Yerardis.

The 2001 Policy states that it was issued by "Pacific Indemnity Company a stock insurance company incorporated in California." (Defs.' Ex. D at 3). However, as the plaintiffs argue, the policy-related documents reference a variety of companies. For example, the 2001 Policy itself identifies the insurer as Pacific, but refers to the Policy as "your Chubb Masterpiece Policy," thanks the insured "for insuring through Chubb" and provides details of Chubb's privacy policy and practices. (*Id.* at 1–2). The same references to Chubb are made in the 2002 Policy. (*See* Defs.' Ex. F). Furthermore, Chubb is identified in the insurance documents as a "division of Federal Insurance Company." (Defs.' Ex. F at 1). Thus, the policy documents on their face raise an issue of fact as to whether Chubb and Federal have any contractual relationship with the plaintiffs, and the defendants' motion based on the absence of such a relationship is denied.

### 5. *Pacific's Counterclaims*

Finally, Pacific is seeking summary judgment on its counterclaims for fraud, intentional misrepresentation, and unjust enrichment.[9] Pacific argues that it is entitled to judgment on its fraud and misrepresentation claims because the Yerardis knowingly made false statements to Pacific, both before and after the loss, in order to induce Pacific to issue the policy and to mislead Pacific in its investigation of their claim, and Pacific relied on these statements to its detriment by issuing the policy and by paying the Boston Federal and ABNY mortgages on the Property. (Defs.' Mem. at 27). Pacific also argues that it is entitled to judgment on its unjust enrichment claim because the plaintiffs benefitted unfairly from Pacific's payments to the banks. (*Id.* at 27–28). However, this court finds that there are disputed issues of fact precluding summary judgment for Pacific on its counterclaims.

In order to establish fraud, "a plaintiff must show 'that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.'" *Stolzoff v. Waste Sys. Int'l, Inc.,* 58 Mass.App.Ct. 747, 759, 792 N.E.2d 1031, 1041 (2003) (quoting *Danca v. Taunton Sav. Bank,* 385 Mass. 1, 8, 429 N.E.2d 1129, 1133 (1982)). Proof of these same elements is necessary to satisfy a claim for intentional misrepresentation. *See Zuckerman v. McDonald's Corp.,* 35 F.Supp.2d 135, 144 (D.Mass.1999) (describing elements of an intentional misrepresentation claim under Massachusetts law). "[G]enerally speaking, issues of intent are considered questions for the jury...." *Id.* at 145. Here, as described in detail above, there is a genuine dispute as to whether the Yerardis knowingly made false statements of material fact during the course of Pacific's investigation. Therefore, Pacific's motion for summary judgment on its coun-

---

9. Although Pacific does not specifically seek summary judgment on its counterclaim for negligent misrepresentation, it contends that "[t]o the extent the court allows Pacific's motion with respect to [the fraud and intentional misrepresentation claims], there is no need for the court to further consider Pacific's claim for negligent misrepresentation...." (Defs.' Mem. at 27 n. 11).

terclaims for fraud and intentional misrepresentation is denied.

■ Additionally, the question whether the Yerardis were unjustly enriched by Pacific's payment of the two outstanding mortgages on the Property depends upon the resolution of the parties' breach of contract claims. Because there are disputed issues of fact as to whether or not the Yerardis are entitled to recover under the terms of the 2002 Policy, Pacific's motion for summary judgment on the unjust enrichment claim also is denied.

## IV. ANALYSIS—JENNIFER YERARDI'S MOTION FOR SUMMARY JUDGMENT

Jennifer Yerardi argues that she is entitled to summary judgment on all of the asserted claims and counterclaims because there is no evidence linking her to the arson or to any insurance fraud and the 2002 Policy should be construed to allow her to recover as an innocent co-insured. Alternatively, she argues that if the 2002 Policy is interpreted to bar coverage for an innocent co-insured, the Policy must be reformed to provide the level of coverage prescribed by Mass. Gen. Laws ch. 175, § 99, which, she contends, allows recovery by an innocent co-insured. The defendants counter that the 2002 Policy unambiguously precludes coverage for all co-insureds when one of the insureds intentionally causes a loss or intentionally conceals or misrepresents a material fact. They further contend that the language of the 2002 Policy is consistent with Massachusetts statutory law and should not be altered. Finally, the defendants assert that Ms. Yerardi is not entitled to coverage in any event because she has not established her innocence.

This court finds that the Yerardis' obligations under the relevant exclusions of the 2002 Policy are joint and that the Policy unambiguously precludes coverage for innocent co-insureds. Additionally, this court concludes that while it is unclear whether Massachusetts statutory law mandates coverage for innocent co-insureds, it is not necessary to resolve that issue because there is a genuine factual dispute as to Ms. Yerardi's innocence. Consequently, Ms. Yerardi's motion for summary judgment is denied.

### A. Massachusetts Law on Innocent Co–Insureds

■ To date, the Massachusetts courts have not found that coverage is available to an innocent co-insured where another insured has engaged in fraud or misconduct that implicates an exclusion clause. The Massachusetts Supreme Judicial Court first addressed the issue in *Kosior v. Continental Ins. Co.*, 299 Mass. 601, 13 N.E.2d 423 (1938). In that case, the plaintiff was an innocent spouse whose husband had set fire to the insured property with intent to defraud the insurance company. *Id.* at 602, 13 N.E.2d at 424. The court determined that the plaintiff was not entitled to coverage under the terms of a policy which provided that "[i]f the insured shall make any attempt to defraud the Company, either before or after the loss, the policy shall be void." *Id.* (internal quotations omitted). Specifically, the court held that where the interests of the co-insureds in an insurance policy are considered joint and nonseparable, the use of the term "insured" in the exclusion clause refers to both insureds, and the innocent co-insured is not entitled to coverage. *Id.* at 604, 13 N.E.2d at 425. The Massachusetts courts have not reassessed whether the rule set forth in *Kosior* "that an innocent insured is barred from recovery by the intentional burning of the property by another insured is still sound policy." *Baker v. Commercial Union Ins. Co.*, 382

Mass. 347, 353 n. 9, 416 N.E.2d 187, 190 n. 9 (1981). Thus, the ruling in *Kosior* "has remained the state of the law in Massachusetts, despite the fact that other jurisdictions now diverge from this construction." *Courtney v. The Commerce Ins. Co.*, 1 Mass. L. Rptr. 133, 1993 WL 818906 *2 (Mass.Super.Aug.27, 1993).

Ms. Yerardi argues that *Kosior* is distinguishable from the present case. In particular, Ms. Yerardi asserts that in contrast to the facts in *Kosior*, the insured property at issue in this action is owned by Ms. Yerardi individually, and the "application of coverage" provision contained in the Policy provides that "[c]overage applies separately to each covered person." (Defs.' Ex. F at Y–1). Therefore, Ms. Yerardi argues, the interests of the Yerardis under the 2002 Policy are separate, and Massachusetts law does not preclude coverage based on the acts of her co-insured spouse. (Pl.'s Mem. at 9–12).

This court agrees that *Kosior* may not apply to cases where the insureds' interests and obligations under the relevant policy are severable.[10] *See Kosior*, 299 Mass. at 604, 13 N.E.2d at 425 ("Cases dealing with policies which by their express terms permit of a severance of interest of the insured are not in point."). However, as detailed below, this court finds that under the 2002 Policy, the insureds' obligations with respect to the exclusions are joint. Nothing in *Kosior* or other Massachusetts cases precludes enforcement of the policy language itself, which does not permit coverage for an innocent co-insured.

## B. *The Policy Language*
■ It is undisputed that the provisions of an insurance policy, "if unambigu-

ous, are to be construed according to their plain meaning." *Money Store/Mass., Inc. v. Hingham Mut. Fire Ins. Co.*, 430 Mass. 298, 300, 718 N.E.2d 840, 842 (1999). The 2002 Policy precludes coverage for an innocent co-insured where another insured intentionally caused a loss or intentionally concealed or misrepresented a material fact. Specifically, the intentional acts provision excludes from coverage "any loss caused intentionally by you or a family member, or by a person directed by you or a family member to cause a loss." (Defs.' Ex. F at B–9). Similarly, the 2002 Policy provides that there will not be coverage "if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss." (*Id.* at Y–1). The term "you" is defined in the Policy to mean "the person named in the Coverage Summary, and a spouse who lives with that person." (*Id.* at A–1). Both Jennifer and Joseph Yerardi are named insureds in the Coverage Summary, as well as being spouses who live together. (*Id.* at Coverage Summary Renewal). Therefore, under both the intentional acts provision and the Policy's misrepresentation and concealment provision, no recovery is available if either of the Yerardis engaged in the prohibited conduct.

■ Ms. Yerardi contends that the "application of coverage" provision renders the exclusionary language ambiguous with respect to an innocent co-insured. Specifically, she argues that if the Policy is construed to preclude coverage for an insured who has not acted improperly, it would negate the language of the Policy which provides that "[c]overage applies separately to each covered person." (Pl.'s Mem. at

10. The issue whether there is joint ownership of the land does not seem to be controlling in *Kosior*. Rather, it is the fact that the insur- ance policy was a joint policy which was critical to the court's conclusion. *Kosior*, 299 Mass. at 604, 13 N.E.2d at 425.

8–9). However, this court finds no conflict between the "application of coverage" provision and the other exclusionary provisions of the Policy.

There is nothing ambiguous or inconsistent about providing for separate coverage determinations, but requiring that certain obligations remain joint. *See, e.g., McAllister v. Millville Mut. Ins. Co.,* 433 Pa.Super. 330, 341, 640 A.2d 1283, 1289 (1994) ("Notwithstanding the provision which defines each named insured as a 'separate insured' under the policy," no coverage is available to innocent co-insureds where "use of the terms 'any' and 'an' in the exclusions clearly indicate that the insureds' obligations under the policy's neglect and intentional provisions are joint, not several."). The 2002 Policy does just that. Although it provides separate coverage to each covered person, it also clearly expresses an intent to create joint obligations and to preclude coverage for innocent co-insureds where the intentional misconduct of a covered person is involved. Thus, "the obligation to refrain from intentional loss [and from intentional concealment or misrepresentation of material facts] is a joint obligation, as it applies to loss caused by any named." *Theriault v. Mut. Fire Ins. Co.,* 10 Mass. L. Rptr. 424, 1999 WL 791926 (Mass.Super.Aug.27, 1999). "Courts have found no ambiguity … in policies which exclude from coverage the intentional or fraudulent acts of 'you or any other insured,' 'any insured,' and 'an insured' " and have found that such language "unambiguously bars coverage for innocent co-insured spouses." *Watson v. United Servs. Auto. Assoc.,* 566 N.W.2d 683, 689 (Minn.1997). *See also Sager v. Farm Bureau Mut. Ins. Co.,* 680 N.W.2d 8, 11–12 (Iowa 2004) (policy provides for no coverage for innocent co-insured where

provisions exclude coverage for malfeasance by "an insured"); *Rena, Inc. v. T.W. Brien,* 310 N.J.Super. 304, 321, 708 A.2d 747, 757 (1998) (provision voiding policy for fraud or misrepresentation by " 'any insured' expresses an intent to create joint obligations," and prohibits recovery by innocent co-insureds). Therefore, notwithstanding the severability language, this court finds that the 2002 Policy unambiguously prohibits recovery by an innocent co-insured where the actions of another insured fall within the scope of the provisions concerning intentional acts and concealment or fraud.

**C. The Standard Form Fire Insurance Policy**

"Clear, unambiguous policy language excluding all fire coverage if *any* insured intentionally [engages in prohibited conduct] is overcome only where controlling legislation prohibits such an exclusion." *Rena, Inc.,* 310 N.J.Super. at 325–26, 708 A.2d at 759. Ms. Yerardi argues that Mass. Gen. Laws ch. 175, § 99 is such legislation. (Pl.'s Mem. at 12–13). However, the Massachusetts courts have not addressed whether the statutory language provides coverage for innocent co-insureds, and in light of the Supreme Judicial Court's ruling in *Kosior,* it is not clear that the Massachusetts courts would so interpret the statute.

Mass. Gen. Laws ch. 175, § 99 provides that "[n]o company shall issue policies or contracts which, under the authority of clause First of section forty-seven, insure against loss or damage by fire or by fire and lightning to property or interests in the commonwealth, other than those of the standard forms herein set forth…."[11] The standard form reads in relevant part:

---

11. The defendants contend that they are not obligated to include these statutory provisions

because Mass. Gen. Laws ch. 175, § 99 Ninth provides that "a company may write upon the

This entire policy shall be void if, whether before or after a loss, *the insured* has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

Mass. Gen. Laws ch. 175, § 99 (emphasis added). Thus, pursuant to the standard fire insurance policy, coverage is unavailable where "the insured" has intentionally engaged in misconduct.

Ms. Yerardi argues that the use of the term "the insured" in the statute is substantially different from the language of the exclusions contained in the 2002 Policy because the statutory language would not bar coverage for innocent co-insureds. (Pl.'s Mem. at 12–13). The Massachusetts courts have not considered whether the legislature's use of the term "the insured" demonstrates an intent to apply the policy exclusions only to a specific insured who has engaged in misconduct and not to innocent insureds. However, it appears that most courts in jurisdictions with similar mandated standard policy language have ruled in favor of the innocent co-insured. *See Sager*, 680 N.W.2d at 13 (courts presented with the question whether use of the phrase "the insured" in the standard fire insurance policy reveals a legislative intent to apply the exclusions only to the malfeasant insured, and not to the innocent co-insured "have almost unanimously ruled in favor of the innocent coinsured spouse"), and cases cited. Nevertheless, it is not clear that the Massachusetts courts would draw the same conclusion. In *Kosior*, the policy at issue became void if "the insured" attempted to defraud the insurer. 299 Mass. at 602, 13 N.E.2d at 424. However, the court ruled that because the policy was joint, the term "insured" applied equally to the innocent co-insured and the insured who had acted fraudulently. *Id.* at 604, 13 N.E.2d at 425. As detailed above, Massachusetts has not reconsidered the policy set forth in *Kosior* that an innocent co-insured is barred from recovery, and it remains the law of the Commonwealth. *Baker*, 416 N.E.2d at 190 n. 9. Consequently, this court cannot conclude that the Massachusetts standard fire policy necessarily conflicts with the language of the exclusions contained in the 2002 Policy or evinces a legislative intent to provide coverage to innocent co-insureds.

In any event, this court does not find it necessary to finally resolve the issue raised by the plaintiff's statute-based argument at this time because the record shows that there are disputed issues of fact as to whether Jennifer Yerardi's own conduct supported the denial of coverage. Even assuming the plaintiff's interpretation of Mass. Gen. Laws ch. 175, § 99 is correct, she has not established that she is entitled to recover as an innocent co-insured as a matter of law.

## D. *Evidence Regarding Ms. Yerardi's Conduct*

█ There is evidence in the record from which a jury could conclude that Pa-

margin or across the face of the policy ... provisions adding to or modifying those contained in the standard form," except that there cannot be any addition to or modification of any provision relating to the "rights of a mortgagee, a cancellation of the policy, a reference of the amount of a loss to three referees or the limitation of actions or suits." However, the introductory paragraph to ch. 175, § 99 provides that all policies must insure in accordance with the standard form except for specific exceptions. The Yerardis argue that the policy language must be "substantially" the same as that prescribed. This issue does not need to be resolved at this juncture in light of this court's conclusion that Ms. Yerardi has failed to establish her innocence as a matter of law.

cific justifiably denied Ms. Yerardi's claim. The evidence indicates that at the time of the fire, the Yerardis were experiencing financial pressure as a result of Ms. Yerardi's investment in the Property. In particular, the record shows that at the time of the arson, Ms. Yerardi had two $750,000 mortgages on the Property, had failed to repay a $105,000 loan from the RMB Card Realty Trust, and was in default on the mortgage loan from ABNY, which was threatening a possible foreclosure action. Additionally, the evidence shows that renovation work had stopped for at least two months due to an order of the Historic Commission, and that the work on the house had not neared completion. Accordingly, notwithstanding the plaintiffs' testimony to the effect that these issues had been substantially resolved, the evidence indicates that in October 2002, Ms. Yerardi's investment in the Property was causing her and her husband considerable financial strain. Thus, a jury could infer that Ms. Yerardi was motivated to commit arson, or to allow someone else to commit arson, in order to collect the insurance proceeds.

Ms. Yerardi argues that there was no financial incentive to commit arson because the Yerardis would have yielded more from a foreclosure than from the insurance proceeds. (Pl.'s Mem. at 17–18). Specifically, she claims that a realtor had told her that once the renovations were complete, the Property might sell for over $4 million. (PF ¶ 13). Additionally, she claims that while the Property was under renovation in 2002, the Yerardis obtained a bank appraisal of $4,375,000. (*Id.*). At best, however, this evidence only raises a question of fact concerning Ms. Yerardi's motives. Even if the Property had a value or potential value of over $4 million, given the status of the construction approvals, combined with Ms. Yerardis' financial obligations relating to the Property, a jury

still could infer that Ms. Yerardi had a motive to commit arson.

There also is evidence in the record supporting the defendants' contention that during the investigation of the claim, Ms. Yerardi intentionally concealed and misrepresented material facts concerning her financial circumstances at the time of the loss. For instance, the evidence shows that in response to Pacific's request for information, the Yerardis produced false tax returns bearing the name of a fictitious tax preparer, as well as a financial statement for Ms. Yerardi that contained false and inaccurate information. Although the Yerardis insist that the documents were submitted because they were responsive to Pacific's requests, and not for the purpose of misleading the insurer, a jury could find otherwise. Similarly, as detailed above, there are disputed facts as to whether the Yerardis made material misrepresentations about the status of the ABNY loan, the status of the Historic Commission's proceedings and the amount of coverage, among other things.

Moreover, Ms. Yerardi may not be able to avoid responsibility for the submission of documents or the information contained therein simply because her husband prepared them or submitted them to Pacific on her behalf. In order to show that one spouse is acting as an agent of the other, "it is enough to show that [he] was acting in [her] behalf and for [her] benefit with [her] consent and knowledge or that upon learning of [his] conduct [she] adopted and ratified it." *Fennell v. Wyzik*, 12 Mass. App.Ct. 909, 910, 422 N.E.2d 1387, 1389 (1981) (quoting *Gordon v. O'Brien*, 320 Mass. 739, 741–42, 71 N.E.2d 221, 223–24 (1947)). "That [s]he may not have known the details of the particular misrepresentations does not negate the relationship...." *Id.* At the appropriate time, a final decision will have to be made by the court

based on undisputed facts or the jury as to whether Mr. Yerardi made material misrepresentations and if they were binding on his wife. If so, Ms. Yerardi will not be able to claim her status as an innocent spouse. *See Harold J. Warren, Inc.*, 386 F.2d at 581–82.

In light of these disputed facts, Ms. Yerardi's motion for summary judgment is denied.

### V. CONCLUSION

For all the reasons detailed herein, the defendants' Motion for Summary Judgment (Docket No. 76) is ALLOWED as to Counts II, III and V of the First Amended Complaint and is otherwise DENIED. The Motion of Jennifer Yerardi for Partial Summary Judgment (Docket No. 72) is DENIED.